**Paul A. BLUME and Judy Ann Blume, Appellants,**

v.

**STATE of Alaska, Appellee.**

**Nos. A–1799, A–1902.**

Court of Appeals of Alaska.

Aug. 17, 1990.

Rex Lamont Butler, Anchorage, for appellant Paul A. Blume.

Jacqueline Bressers, Susan Orlansky, Asst. Public Defenders, and John B. Salemi, Public Defender, Anchorage, for appellant Judy Ann Blume.

Robert D. Bacon, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Douglas B. Baily, Atty. Gen., Juneau, for appellee.

Philip J. McCarthy, Deputy Public Advocate, and Brant McGee, Public Advocate, Anchorage, for A.B. as guardian ad litem.

Before BRYNER, C.J., and COATS and SINGLETON,* JJ.

## OPINION

BRYNER, Chief Judge.

▇▇▇▇ Paul and Judy Blume were jointly convicted of two counts of first-degree assault and one count of fourth-degree assault. The Blumes appeal, contending that the trial court erred in ruling that their five-year-old daughter, A.B., was competent to testify as a prosecution witness. The Blumes also argue that the court violated their constitutional right to confrontation by requiring them to remain outside the physical presence of their daughter while she testified at trial.[1] Although we affirm the trial court's finding that A.B. was competent to testify, we conclude that the court erred in denying the Blumes the right to face-to-face confrontation with A.B. at trial.

## FACTS

Judy Blume and her husband, Paul, lived in Anchorage with their three young daughters in March of 1986. During this time, Judy Blume invited a friend's two-year-old daughter, J.G., to spend several days horseback riding with the Blume family. Five days later, when the Blumes had not yet returned J.G. home, her mother paid a visit to the Blumes' house. She found J.G. there, severely battered, burned, and dehydrated. Many of J.G.'s wounds were infected, and all appeared to be deliberately inflicted.

---

* This case was submitted for decision prior to Judge Singleton's resignation.

1. Paul Blume has also raised a number of additional arguments that Judy Blume has not joined in and that require only summary consideration. Blume has challenged the sufficiency of the evidence against him on all counts, both before the grand jury and at trial. Reviewing the evidence and the inferences arising therefrom in the light most favorable to the state, however, we conclude that the evidence before the grand jury would have warranted a conviction if unexplained or uncontradicted and was therefore legally sufficient. *York v. State,* .757 P.2d 68, 72 (Alaska App.1988). Similarly, the evidence presented at trial was sufficient to permit fair minded jurors to disagree on the question of whether the state had established Blume's guilt beyond a reasonable doubt, and it was thus sufficient as a matter of law. *See Dorman v. State,* 622 P.2d 448, 453 (Alaska 1981).

Blume further charges prosecutorial misconduct and a variety of evidentiary errors before the grand jury: he contends that the prosecutor improperly coached J.G., elicited irrelevant evidence from Dr. Mark Nelson, elicited hearsay and other inappropriate testimony from Judy Nelson and Investigator Mills, and improperly used leading questions in interrogating Dr. Nelson. We find no merit to Blume's arguments. In any event, even had the testimony Blume complains of been erroneously admitted, the remaining evidence before the grand jury would still have been more than sufficient to support the indictment. Any error was therefore harmless. *Newman v. State,* 655 P.2d 1302, 1306 (Alaska App.1982).

Blume argues that the indictment should have been dismissed because the prosecutor failed to present exculpatory evidence to the grand jury. The prosecutor, however, had no duty to develop evidence for the defense or to present leads that might prove favorable to the defendant if pursued at trial. *Tookak v. State,* 648 P.2d 1018, 1021 (Alaska App.1982). The evidence that Blume complains of clearly falls into this category.

Blume argues that the trial court erred in failing to sever his case from that of Judy Blume. However, Blume appears to have withdrawn his request for severance after the trial court ordered his case rejoined with Judy Blume's. In any event, the arguments that Blume presents on appeal in support of severance differ from those that he presented below. Since the trial court has not yet considered these arguments, Blume may present them to that court if, on remand, the state seeks a joint retrial of the charges against the Blumes.

Blume next presents several claims involving alleged evidentiary error at trial. Because we reverse Blume's conviction on other grounds and the errors that he alleges may not recur on retrial, we need not decide these issues. We similarly need not decide Blume's contention that the trial court erred in failing to grant his motion for a new trial.

Finally, both Paul and Judy Blume have contended that the sentences they received are excessive. In view of our reversal, we do not reach the sentencing issues.

J.G.'s mother immediately took her child to the emergency room of a nearby hospital, where she was examined by Dr. Mark Nelson. Nelson subsequently testified that J.G. was "one of the most severely bruised and messed-up kids that I've ever seen in my life." Nelson found that J.G. had been repeatedly beaten about the back and abdomen; the blows had been delivered with a degree of force that was potentially life-threatening. She had been pulled by the ears until they had almost been torn off. She had also received numerous second- and third-degree burns to various areas of her face and body. The burns were severely infected. Nelson believed that these wounds could have been fatal or permanently debilitating if left untreated.

Anchorage Police Investigator Linda Feldthausen later interviewed the Blume's five-year-old daughter, A.B. In her statement to Feldthausen, A.B. implicated both Paul and Judy Blume in the assaultive conduct that resulted in J.G.'s injuries. Based largely on A.B.'s testimony, the Blumes were charged and ultimately convicted of first- and fourth-degree assault.

### COMPETENCY

The Blumes initially claim that the trial court erred in finding A.B. competent to testify at trial.[2] Alaska Rule of Evidence 601 governs the determination of competency:

> A person is competent to be a witness unless the court finds that (1) the proposed witness is incapable of expressing himself concerning the matter so as to be understood by the court and jury either directly or through interpretation by one who can understand him, or (2) the proposed witness is incapable of understanding the duty of a witness to tell the truth.

The Alaska Supreme Court has held that the requirements of this rule are satisfied when a child witness demonstrates the ability to perceive facts accurately, to relate them intelligibly, and to understand the need to testify truthfully. *Sevier v. State*, 614 P.2d 791, 794 (Alaska 1980).

In contending that the trial court erred in finding A.B. competent to testify, the Blumes rely heavily on portions of the testimony of Dr. Martin Atrops, a psychologist who was providing A.B. with therapy. When the Blumes first questioned A.B.'s competence, the trial judge conducted an *in camera* hearing to determine Atrops' opinion on the issue. During the *in camera* hearing, Atrops did express doubt concerning A.B.'s ability to testify. His reservations, however, were not specifically based on the criteria for witness competency established in A.R.E. 601. Rather, Atrops feared that A.B. might be easily confused or misled if questioned as if she were an adult. Atrops pointed out that A.B. tended to interpret and respond to questions in a wholly subjective manner that is characteristic of young children. Her personalized, child-like manner of interpreting questions occasionally made it appear that her answers were nonresponsive.

Based on Atrops' *in camera* testimony, the trial court ordered a further competency hearing with participation by all parties. At the second hearing, the prosecution carefully questioned Atrops with regard to the specific criteria for witness competency established in A.R.E. 601. Applying these criteria, Atrops was far more confident about A.B.'s ability to testify. It became apparent that Atrops' reservations concerning A.B. had stemmed not from her ability to give useful and reliable testimony, but rather from the danger that her testimony might be distorted or misunderstood if she were held to adult standards.

Atrops specifically testified that A.B. was capable of accurately perceiving events and of describing her perceptions in the way that could be reasonably understood. Atrops further expressed confidence about A.B.'s ability to testify truthfully, characterizing her as basically a truthful, innocently candid child.

competency to testify is therefore not at issue.

---

**2.** J.G., the alleged victim, testified before the grand jury but did not testify at trial. Her

Atrops was the only witness to testify at the competency hearing. Relying on Atrops' testimony, as well as on his own familiarity with the testimony that A.B. had given before the grand jury, the trial judge concluded that A.B. met the criteria established in A.R.E. 601 and was competent to testify at trial. The Blumes claim that this decision was error.

Under the standard set forth in A.R.E. 601, the trial court is obligated to evaluate the competency of each prospective witness on a case-by-case basis, relying on the totality of the circumstances. The trial court is vested with broad discretion on the issue of competency, and its decision to allow a witness to testify is subject to reversal only for abuse of discretion—that is, only when there is no substantial evidence to support the competency ruling.

In arguing the issue of competency, the Blumes have emphasized selected portions of Atrops' testimony, disregarding other significant portions. On the whole, Atrops' testimony strongly supports the trial court's conclusion that A.B. was competent to testify. Moreover, A.B.'s testimony before the grand jury, which the trial court was familiar with, was reasonably complete, coherent, and comprehensible. Because there is substantial evidence to support the determination of competency, we find no basis for concluding that the trial court abused its discretion in allowing A.B. to testify.

Judy Blume nevertheless contends that A.B. should have been categorically precluded from testifying by virtue of her age. Blume cites a variety of psychological studies that question the cognitive abilities of young children to render meaningful and reliable testimony. The studies cited by Blume, however, are presented for the first time on appeal. Had Blume called these studies to the attention of the trial court, it could have considered them as part of its overall determination of A.B.'s competency. Furthermore, had expert testimony based on these studies been offered at trial, it may well have provided useful information for the jury's consideration in evaluating A.B.'s testimony.

In presenting these authorities for the first time on appeal, however, Blume in effect asks this court to preclude, as a matter of law, the testimony of virtually all children under seven years of age. Any such conclusion would nullify the individualized competency standard described by A.R.E. 601 and would run counter to the mainstream of cases dealing with competency of child witnesses. The Alaska Supreme Court has repeatedly emphasized that there is no minimum age below which a child is presumed incompetent to testify. *See, e.g., Sevier,* 614 P.2d at 794; *McMaster v. State,* 512 P.2d 879, 882–83 (Alaska 1973). These decisions are in accord with the sound weight of authority from other jurisdictions.[3]

While the psychological studies cited by Blume raise serious and substantial questions and provide significant and potentially useful information, we are unprepared to find them so convincing or conclusive as to mandate the categorical exclusion of testimony rendered by young children. At least for the time being, the competency of young children must continue to be determined on a case-by-case basis through application of the criteria set forth in A.R.E. 601.[4]

---

3. For example, see *Barnes v. State,* 173 Ga.App. 907, 328 S.E.2d 583, 584 (1985); *People v. McNichols,* 139 Ill.App.3d 947, 94 Ill.Dec. 375, 487 N.E.2d 1252, 1256 (1986); *State v. Brotherton,* 384 N.W.2d 375 (Iowa 1986); *State v. Armstrong,* 453 So.2d 1256, 1259–60 (La.App.1984); *Commonwealth v. Brusgulis,* 496 N.E.2d 652, 655–57 (Mass.1986); *State v. Jenkins,* 83 N.C. App. 616, 351 S.E.2d 299, 301–03 (1986); *State v. Griffith,* 45 Wash.App. 728, 727 P.2d 247, 251–52 (1986).

4. As part of his competency argument, Paul Blume additionally contends that A.B. was never properly sworn in as a witness because she was incapable of understanding the formal significance of the witness oath. Blume points out that, in her preliminary questioning, A.B. was unable to understand the abstract concept of truth. The core purpose of the oath, however, is to instill in the witness the seriousness of the obligation to tell the truth. *See Flores v. State,* 443 P.2d 73, 77–78 (Alaska 1968); *see also* A.R.E. 603 commentary. An abstract under-

## CONFRONTATION

The Blumes next contend that the trial court erred in barring them from the courtroom during A.B.'s testimony. Prior to trial, A.B.'s guardian *ad litem* (GAL) moved for an order permitting A.B.'s testimony to be presented to the jury by closed circuit television with the judge, counsel, and the witness in one room, and the defendants, the jury, and spectators in another. The GAL's motion summarized the emotional and psychological difficulties that A.B. had experienced since being removed from her parents' home following their arrest. The GAL expressed concern that A.B. might suffer additional, substantial psychological trauma if forced to testify in a formal courtroom setting. The GAL asserted that such a setting might result in a major setback to the progress that A.B. had recently been making in therapy.

The GAL's motion, however, did not make any specific allegations as to how the presence of the Blumes in the courtroom while A.B. testified might affect their daughter. Rather, the motion was more generally concerned with the trauma that could result from A.B.'s having to testify in the formal courtroom setting. Additionally, the GAL's motion did not allege that the traumatic effect of testifying in court would significantly impair the substance of A.B.'s testimony. The motion appears to have been concerned not with the traumatic effects on A.B.'s testimony, but rather with the effects of any psychological stress on A.B.'s life after she testified.

The trial court denied the GAL's motion for televised testimony, relying principally on *Stores v. State*, 625 P.2d 820, 828–29 (Alaska 1980). In *Stores*, the Alaska Supreme Court upheld the accused's right to have witnesses testify personally before the jury at trial. Rejecting the prosecu-

tion's contention that a video deposition amounted to the equivalent of live testimony, *Stores* emphasized the importance of allowing the jury to determine the weight and credibility of a witness by personally observing testimony in open court.

*Stores*, however, dealt exclusively with the importance of allowing the jury to hear live testimony. It did not consider or discuss the accused's right to confront witnesses personally at trial. Apparently for this reason, while the trial judge in the present case believed that *Stores* mandated A.B.'s personal appearance before the jury, he did not believe that it required her to render her testimony in the actual physical presence of the Blumes. On his own initiative, the trial judge expressed interest in having the Blumes absent from the courtroom when A.B. testified.

During the hearing on A.B.'s competency to testify, the judge asked Dr. Atrops about the psychological effect of having A.B. testify in her parents' presence. Atrops responded that A.B. might be a bit anxious and confused about the significance of the gathering and its effect on her parents. He concluded that A.B. "might tend to defer to [the Blumes] in some way."

At the conclusion of the evidentiary hearing, the judge, evidently prompted by Atrops' response, proposed conducting proceedings in Anchorage's media courtroom, where a one-way mirror had been installed separating the courtroom proper from an adjacent area in which media personnel could observe and photograph proceedings without being visible to participants. The judge suggested that the parties consider the feasibility of having the Blumes view and listen to the testimony of A.B. from the media room adjacent to the courtroom.

standing of the significance of the oath or of the concept of truthfulness is thus unnecessary so long as a child understands the need to testify candidly. *Sevier*, 614 P.2d at 794. In the present case, although A.B. displayed an understandable inability to explain what truth was in the abstract, she certainly demonstrated a functional ability to distinguish between the truth and a lie. In addition to formally taking the oath to testify truthfully, A.B. promised to only

"talk about true things," and assured the court that she would talk only about things that were "real." On direct examination A.B. promised to talk only about "things that she knew," and on cross-examination, she indicated that she was able to distinguish truth from "stories." Considering the totality of the record, there is ample support for the conclusion that A.B. adequately understood the importance of testifying truthfully.

The judge then set a separate hearing to consider argument on the proposal.

At the subsequent hearing, neither the Blumes nor the prosecution fully endorsed the court's proposal. The Blumes insisted that their constitutional right to confrontation entitled them to remain in A.B.'s physical presence and view during her testimony. For its part, the prosecution expressed reservations as to the effect of the court's proposal on the Blumes' confrontation right. The state also expressed uncertainty as to the impact of the Blumes' presence on A.B.'s testimony. Accordingly, the prosecution suggested several alternatives that the court might consider exploring before deciding whether to require the Blumes to remove themselves from the courtroom during A.B.'s testimony.

In response, the trial judge indicated his concern that A.B. might already have been intimidated. The judge referred to testimony given by A.B. before the grand jury and by Atrops during the competency hearing. During her grand jury testimony, A.B. had been asked if her parents had told her not to discuss their case with other people. A.B. had responded affirmatively. The question was not followed-up. In testifying at the competency hearing, Atrops had indicated that, during a recent counseling session, A.B. had been uncooperative and reticent. On that occasion, A.B. was accompanied by her paternal grandmother. Later, outside her grandmother's presence, Atrops asked A.B. if she had been told not to talk about the charges against her parents. According to Atrops, A.B. nodded her head yes. Atrops did not attempt to determine precisely who had instructed A.B. not to talk.

When the court voiced concern over the possibility of witness intimidation, Paul Blume's counsel indicated that his own client had never admitted taking any intimi-

dating actions toward his daughter. Counsel suggested a hearing on the issue if the court believed it to be significant. Counsel insisted that any charges of intimidation should be supported by evidence.[5]

Despite the Blumes' confrontation clause objections, despite Paul Blume's request for a hearing on the intimidation issue, and despite the prosecution's proposed alternatives to exclusion, the trial court decided to order the Blumes to remain outside the courtroom during A.B.'s testimony. The court stated, in relevant part:

[I]t is just common sense that someone having to testify as to those acts in front of and within ten feet of the two people that are on earth to protect that child has got to go through an enormous amount of trauma. And I don't think you need to be a psychiatrist or a psychologist to determine that.

Noting the GAL's motion, Dr. Atrops' testimony, and the portions of the record suggesting that A.B. had been advised not to talk about the case, the trial court concluded:

It just seems to be there's just absolutely no doubt that testifying ten or fifteen feet from these defendants, one it will based on what the doctor said it will affect how they testify, what they testify to not based on factors relating to truth but based on factors relating to one the trauma of testifying against their parents and two, testifying against people whom she observed according to her testimony at grand jury inflict an incredible amount of damage on a child roughly her age.

During A.B.'s trial testimony, the Blumes remained behind the one-way mirror in the media area adjacent to the courtroom. From there, they could see and hear A.B. testify, but she was shielded from them. The court arranged a system allow-

---

**5.** In response to the court's concern on the issue of attempts to intimidate A.B., the state offered to call one of its investigating officers to testify that both A.B. and her sister had made statements indicating that they were instructed not to talk about the case. In addition, the state offered to call a social worker to testify that, on one occasion, both A.B. and her sister had been incommunicative and difficult to deal with after they had spent several days visiting with their paternal grandmother. The state's offer of proof was not pursued, however, because the trial court ultimately proceeded to decide the question of the Blume's presence in the courtroom during A.B.'s testimony without conducting any further evidentiary hearings.

ing the Blumes to communicate with their attorneys, who remained in the courtroom. The court instructed the jury that the Blumes had voluntarily waived their right to be present while A.B. testified, in order to avoid distracting her. The court cautioned the jury to draw no inferences from the Blumes' absence.

The Blumes argue that their right to be personally present in the courtroom and to confront A.B. face-to-face while she testified is secured by the confrontation clauses of the United States and Alaska Constitutions.[6] Cases decided since the Blumes were convicted provide strong support for their claim.

At the time of the Blumes' trial, the constitutional right to confrontation was viewed primarily as securing the accused's right to cross-examine adverse witnesses at trial. Apart from its role in guaranteeing cross-examination, the confrontation clause had not been decisively held to guarantee personal, face-to-face confrontation between defendant and accuser. *See generally* 5 J. Wigmore, Evidence §§ 1395–97 (J. Chadbourn rev. 1974).

Not long after the Blumes' trial, however, the United States Supreme Court decided the landmark case of *Coy v. Iowa,* 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988). In *Coy,* the Court considered a challenge, under the confrontation clause to an Iowa statute that sought to protect youthful victims of abuse by authorizing trial courts to order defendants concealed behind one-way screens during the victims' testimony. The Court in *Coy* expressly held "that the Confrontation Clause guar-

antees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." *Id.* at 1016, 108 S.Ct. at 2800.[7]

In reaching this conclusion, the Court observed:

[F]ace-to-face presence may, unfortunately, upset the truthful rape victim or abused child; but by the same token it may confound and undo the false accuser, or reveal the child coached by a malevolent adult. It is a truism that constitutional protections have costs.

*Id.* at 1020, 108 S.Ct. at 2802.

Although leaving open the possibility that exceptions to the right to face-to-face confrontation may be justified "when necessary to further an important public policy," *id.* at 1021, 108 S.Ct. at 2803, *Coy* held the challenged Iowa statute invalid because it did not require "individualized findings that these particular witnesses needed special protection." *Id.*

In the wake of *Coy,* many courts have decided similar confrontation clause challenges involving a variety of child-witness statutes.[8] The state court decisions have almost unanimously interpreted *Coy* as allowing exceptions to the right of face-to-face confrontation when case-specific evidence establishes the actual necessity of protecting a child from testifying in the physical presence of the accused.[9]

While state courts have been quick to conclude that exceptions may be made to the confrontation clause's guarantee of face-to-face confrontation, they have been far less ready to find that such exceptions should be routinely allowed. The cases

---

6. United States Constitution, amendment VI, provides, in relevant part:
   In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him....
   Alaska Constitution, article I, section 11, provides, in relevant part:
   *Rights of Accused.* In all criminal prosecutions, the accused ... is entitled ... to be confronted with the witnesses against him....

7. It is noteworthy that, in reaching its conclusion to exclude the Blumes from the courtroom, the trial court expressly relied on Dean Wigmore, whose treatise accords minimal importance to the confrontation clause beyond its

guarantee of cross-examination. It is particularly significant that Wigmore's view has now been seriously undermined by *Coy,* 487 U.S. at 1018 & n. 2, 108 S.Ct. at 2801 & n. 2.

8. For a collection of recent state decisions and a list of states that have adopted statutory provisions similar to those considered in *Coy, see* Note, *Protection of Child Witnesses and the Right of Confrontation: A Balancing of Interests,* 7 Alaska L.Rev. 223, 233–36 (1990) (hereinafter *Protection of Child Witnesses* ).

9. *See generally Protection of Child Witnesses,* 7 Alaska L.Rev. at 235 & n. 67.

have by and large emphasized that a compelling, case-specific showing of necessity must be made before the accused's confrontation rights may be diluted in the interest of protecting a young witness. The emerging consensus of state cases focuses on the likely effect of the defendant's presence on the child witness's testimony. Most cases require a showing that the child's ability to give reliable testimony would be significantly impaired by the presence of the accused.[10]

Courts have repeatedly emphasized that mere nervousness, unwillingness, or reluctance to testify in the presence of the accused will not justify deprivation of the right to face-to-face confrontation.[11] Some courts have likened the requisite level of impairment to a finding of unavailability, reasoning that the right to face-to-face confrontation may be denied only when the defendant's presence would so hinder a witness's ability to testify as to border on rendering the witness unavailable.[12]

A number of courts have also emphasized that, before face-to-face confrontation may be denied, the evidence must establish that a witness's inability to testify effectively will result specifically from the defendant's presence rather than from other potentially traumatic aspects of the typical courtroom setting.[13] The decisions further stress that a trial court's finding of necessity must be based on actual evidence rather than on conjecture or generalized assumptions.[14] Additionally, some courts have insisted that the necessity of denying face-to-face confrontation be established by clear and convincing evidence.[15]

The decisional trend in other jurisdictions is mirrored in a statute recently adopted by the Alaska legislature. Alaska Statute 12.-45,046, enacted after the Blumes had already been tried, authorizes trial courts to protect children appearing as witnesses in criminal proceedings by ordering their testimony taken out of the physical presence of the defendant, either by closed circuit television or through one-way mirrors.[16]

---

**10.** *See, e.g., State v. Vincent,* 159 Ariz. 418, 768 P.2d 150, 164 (1989); *State v. Bonello,* 210 Conn. 51, 554 A.2d 277 (1989); *State v. Chisholm,* 245 Kan. 145, 777 P.2d 753 (1989); *Craig v. State,* 316 Md. 551, 560 A.2d 1120, 1127 (1989), *rev'd on other grounds, Maryland v. Craig,* — U.S. —, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990); *State v. Conklin,* 444 N.W.2d 268 (Minn.1989); *State v. Davidson,* 764 S.W.2d 731, 733 (Mo.App. 1989); *State in Interest of B.F.,* 230 N.J.Super. 153, 553 A.2d 40 (App.1989); *State v. Taylor,* 562 A.2d 445, 453 (R.I.1989). *But see Glendening v. State,* 536 So.2d 212, 218 (Fla.1988); *Brady v. State,* 540 N.E.2d 59, 65 (Ind.App.1989).

**11.** *See, e.g., State v. Vincent,* 159 Ariz. 418, 768 P.2d 150, 160 (1989); *People v. Thomas,* 770 P.2d 1324, 1328 (Colo.App.1988); *State v. Conklin,* 444 N.W.2d 268, 274 (Minn.1989).

**12.** *See, e.g., State v. Vincent,* 159 Ariz. 418, 768 P.2d 150, 164 (1989); *State v. Chisholm,* 245 Kan. 145, 777 P.2d 753, 758 (1989); *Craig v. State,* 316 Md. 551, 560 A.2d 1120, 1126 (App. 1989), *rev'd on other grounds, Maryland v. Craig,* — U.S. —, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990); *State v. Conklin,* 444 N.W.2d 268, 271 (Minn.1989); *State v. Davidson,* 764 S.W.2d 731, 733 (Mo.App.1989); *State v. Taylor,* 562 A.2d 445, 453 (R.I.1989).

**13.** *See, e.g., State v. Vincent,* 159 Ariz. 418, 768 P.2d 150, 160–61 (1989); *State v. Conklin,* 444 N.W.2d 268, 274 (Minn.1989); *People v. Cintron,* 75 N.Y.2d 249, 552 N.Y.S.2d 68, 72, 551 N.E.2d 561 (1990).

**14.** *See, e.g., People v. Thomas,* 770 P.2d 1324, 1328 (Colo.App.1988); *State v. Davidson,* 764 S.W.2d 731, 734 (Mo.App.1989); *People v. Cintron,* 75 N.Y.2d 249, 552 N.Y.S.2d 68, 78, 551 N.E.2d 561, 571 (1990).

**15.** *See, e.g., State v. Bonello,* 210 Conn. 51, 554 A.2d 277, 280 (1989); *State v. Chisholm,* 245 Kan. 145, 777 P.2d 753, 757–58 (1989); *State in Interest of B.F.,* 230 N.J.Super. 153, 553 A.2d 40, 43 (App.1989); *People v. Cintron,* 75 N.Y.2d 249, 552 N.Y.S.2d 68, 551 N.E.2d 561 (1990); *State v. Taylor,* 562 A.2d 445, 453 (R.I.1989).

**16.** AS 12.45.046 provides:
*Testimony of Children in Criminal Proceedings.*
  (a) In a criminal proceeding under AS 11.-41 involving the prosecution of an offense committed against a child under the age of 13, or witnessed by a child under the age of 13, the court
    (1) may appoint a guardian ad litem for the child;
    (2) on its own motion or on the motion of the party presenting the witness or the guardian ad litem of the child, may order that the testimony of the child be taken by closed circuit television or through one-way mirrors if the court determines that the testimony by the child victim or witness under normal court procedures would result in the child's inability to effectively communicate.
  (b) In making a determination under (a)(2) of this section, the court shall consider factors it considers relevant, including

Before ordering such a procedure, however, the trial court must affirmatively determine "that the testimony by the child victim or witness under normal court procedures would result in the child's inability to effectively communicate." AS 12.45.-046(a)(2).

Most recently, in *Maryland v. Craig*, —— U.S. ——, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990), the United States Supreme Court has definitively resolved the issue left open in *Coy*. In *Craig*, the Court expressly confirmed that the demands of the confrontation clause must yield to an individualized showing of necessity to protect the integrity of a child witness's testimony:

In sum, we conclude that where necessary to protect the child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child's ability to communicate, the Confrontation Clause does not prohibit use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation.

—— U.S. at ——, 110 S.Ct. at 3170.

In reaching this conclusion, the Court nevertheless emphasized: "That the face-to-face confrontation requirement is not absolute does not, of course, mean that it may easily be dispensed with." *Id.* at ——, 110 S.Ct. at 3166. Describing in broad

(1) the child's chronological age;

(2) the child's level of development;

(3) the child's general physical health;

(4) any physical, emotional, or psychological injury experienced by the child; and

(5) the mental or emotional strain that will be caused by requiring the child to testify under normal courtroom procedures.

(c) If the court determines under (a)(2) of this section that the testimony by the child victim or witness under normal court procedures would result in the child's inability to effectively communicate, the court may order that the testimony of the child be taken in a room other than the courtroom and be televised by closed circuit equipment in the courtroom to be viewed by the defendant, the court, and the finder of fact in the proceeding. If the court authorizes use of closed circuit televised testimony under this subsection,

(1) each of the following may be in the room with the child when the child testifies:

(A) the prosecuting attorney;

(B) the attorney for the defendant; and

(C) operators of the closed circuit television equipment;

(2) the court may, in addition to persons specified in (1) of this subsection, admit a person whose presence, in the opinion of the court, contributes to the well-being of the child.

(d) When a child is to testify under (c) of this section, only the court and counsel may question the child. The persons operating the equipment shall do so in as unobtrusive a manner as possible. If the defendant requests, the court shall excuse the defendant from the courtroom, shall permit the defendant to attend in another location, and shall afford the defendant a means of viewing the child's testimony and of communicating with the defendant's attorney throughout the proceedings. Upon request of the defendant or the defendant's attorney, the court shall permit a recess to allow them to confer. The court shall provide a means of communicating with the attorneys during the questioning of the child. Objections made by the attorneys to questions of a child witness may be resolved in the courtroom if the court finds it necessary.

(e) If the court determines under (a)(2) of this section that the testimony by the child victim or witness under normal court procedures would result in the child's inability to effectively communicate, the court may authorize the use of one-way mirrors in conjunction with the taking of the child's testimony. The attorneys may pose questions to the child and have visual contact with the child during questioning, but the mirrors shall be placed to provide a physical shield so that the child does not have visual contact with the defendant and jurors.

(f) If the court does not find under (a)(2) of this section that the testimony by the child victim or witness under normal court procedures will result in the child's inability to effectively communicate, the court may, after taking into consideration the factors specified in (b) of this section, supervise the spatial arrangements of the courtroom and the location, movement, and deportment of all persons in attendance so as to safeguard the child from emotional harm or stress. In addition to other procedures it finds appropriate, the court may

(1) allow the child to testify while sitting on the floor or on an appropriately sized chair;

(2) schedule the procedure in a room that provides adequate privacy, freedom from distractions, informality, and comfort appropriate to the child's developmental age; and

(3) order a recess when the energy, comfort, or attention span of the child warrants.

terms the minimal prerequisites for denial of face-to-face confrontation, the Court voiced approval in the following terms of a Maryland statute substantially similar to AS 12.45.046:

> The requisite finding of necessity must of course be a case specific one: the trial court must hear evidence and determine whether use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify.... The trial court must also find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant. Denial of face-to-face confrontation is not needed to further the state interest in protecting the child witness from trauma unless it is the presence of the defendant that causes the trauma. In other words, if the state interest were merely the interest in protecting child witnesses from courtroom trauma generally, denial of face-to-face confrontation would be unnecessary because the child could be permitted to testify in less intimidating surroundings, albeit with the defendant present. Finally, the trial court must find that the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimus*, i.e., more than "mere nervousness or excitement or some reluctance to testify...." We need not decide the minimum showing of emotional trauma required for use of the special procedure, however, because the Maryland statute, which requires a determination that the child witness will suffer "serious emotional distress such that the child cannot reasonably communicate," ... clearly suffices to meet constitutional standards.

Id. at ——, 110 S.Ct. at 3169 (citations omitted).[17]

In the present case, we see no need to chart the outer boundaries of the confrontation clause or to venture beyond the territory covered by the United States Supreme Court's decision in *Craig*. Specifically, for purposes of resolving this case it is not necessary for us to decide the precise level of impairment of a child witness's testimony that would justify denial of face-to-face confrontation. Nor is it necessary to decide whether the likelihood of impairment must be established by clear and convincing evidence.

Our review of *Craig, Coy*, the various relevant state court decisions, and Alaska's own statutory provision reveals substantial accord as to the minimal requirements of the confrontation clause. We are convinced that, at a minimum, the constitution forbids denying the accused face-to-face confrontation with an accuser in a criminal trial absent specific evidence and an express finding that the probable effect of the defendant's presence on the witness would significantly impair the substance of the witness's testimony. A mere finding of some general, or *de minimus* effect will not suffice.[18] Likewise, generalized, subjective impressions or assumptions will not substitute for case-specific evidence.[19]

■■■ Here, neither the evidence presented below nor the findings made by the trial court meet the minimal standard. To the extent that the trial court purported to rely on the information contained in the GAL's motion to present A.B.'s testimony by closed circuit television, we note initially that the information was not evidence, but merely a recitation of the GAL's impressions, coupled with the GAL's prediction of possible harm based on those impressions.

---

**17.** The Supreme Court went on to reject as unnecessarily inflexible the Maryland Court of Appeals' conclusion that the confrontation clause required an initial unsuccessful effort to question the child victim in the defendant's presence, in order to determine the effects of the defendant's presence on the child. The Court in *Craig* remanded to the Maryland Court of Appeals for reconsideration in light of its opinion. —— U.S. at ——, 110 S.Ct. at 3171.

**18.** *See Maryland v. Craig*, —— U.S. at ——, 110 S.Ct. at 3170; *see also State v. Bonello*, 210 Conn. 51, 554 A.2d 277 (1989).

**19.** *See, e.g., People v. Thomas*, 770 P.2d 1324 (Colo.App.1988); *State v. Conklin*, 444 N.W.2d 268, 274 (Minn.1989); *People v. Cintron*, 75 N.Y.2d 249, 552 N.Y.S.2d 68, 551 N.E.2d 561 (1990).

More significantly, the GAL's motion was concerned with the probable traumatic effect of the normal courtroom setting on A.B.'s general emotional and psychological well-being, and not specifically with the likely impact of her parents' presence on her ability to communicate effectively with the jury.

The evidence in the record concerning possible attempts to instruct A.B. not to testify also does not suffice to support a finding of necessity for deprivation of face-to-face confrontation. Absent some evidence that A.B. was likely to respond to the Blume's mere presence in the courtroom by refusing to testify, the fact that A.B. might have previously been instructed not to talk to other people about the case is of minimal significance. More significantly, despite an express request for an evidentiary hearing by Paul Blume's counsel, this issue was never fully litigated below. Furthermore, in excluding the Blumes from the courtroom, the trial court did not specifically find either that they had attempted to influence their daughter's testimony or that, in light of that influence, their presence in the courtroom would significantly affect her testimony.

Reliance on Dr. Atrops' testimony to support exclusion of the Blumes from the courtroom is similarly unavailing. Atrops undeniably believed that the Blumes' presence in the courtroom would probably have some influence on A.B. and was likely to render her somewhat more deferential. However, Atrops never purported to testify that this influence would be more than *de minimus* or that it would impair A.B.'s ability to communicate with the jury to any significant degree. Indeed, according to Atrops, one possible effect of the Blumes' presence on A.B. was actually that the child might be more truthful in her testimony.[20] On the whole, nothing in Atrops' testimony supports the conclusion that the Blumes' presence in the courtroom was likely to have a substantial effect on A.B.'s testimony or that that effect would necessarily be negative.

It is of course conceivable that the trial court might have relied on its own observations in finding a need to protect A.B., rather than on the expert testimony of Dr. Atrops or the information provided by the GAL. The trial court's findings, however, set forth no viable independent basis for a finding that the Blumes' presence would render A.B. incapable of communicating effectively with the jury.

It does not appear that the court personally spoke with or observed A.B. While the court did review the record of A.B.'s grand jury testimony, nothing contained therein would justify the conclusion that A.B. could not testify effectively in her parents' presence. To the contrary, even though A.B. told the grand jury that she had been instructed by her parents not to talk about the case, she was able to testify

---

**20.** Thus, Dr. Atrops stated, in response to questioning by the court:

COURT: What effect do you think it would have upon her testifying in court with her parents that close to her regarding acts committed by her parents? I'm not talking about her ability to testify. Would there be any bad effects on her? If she was allowed to testify I'm trying to find out what would be the best scenario for her well-being in terms of testifying, balancing other people's rights?

ATROPS: I don't know. I think basically she would be a bit—I think anxious and somewhat confused about what the meaning of significance is of this large gathering of people in this setting and that may have some general concern about what this might mean relative to their parents and....

COURT: Would it be better for her or worse for her as far as her parents—her parents—do you know her parents?

ATROPS: I've not really met them.

COURT: They're the two other people sitting at the table on your left and she'd be in the same chair, they would be sitting right there. Would that be something that would be good or bad for her and would it affect her ability to be able to speak?

ATROPS: I think if she were looking at them and also knew that they were real close by that she might tend to defer to them in some way. If she were to see a facial expression or gesture in response to something that she may have answered or that she might be thinking about or talking about, *I think that her testimony could be swayed* somewhat by a gesture or a response from a parent. *Perhaps wanting to please, wanting to be honest,* not wanting to say anything that could be hurtful or problematic. (Emphasis added.)

reasonably effectively before the grand jury, suggesting that any effort by her parents had little lasting effect.

In its findings, the trial court appears to have placed heavy reliance on its own common sense assumptions concerning the likely effects of a parents' presence on a child witness. In relevant part, the court found:

[I]t is just common sense that someone having to testify as to those acts in front of and within ten feet of the two people that are on earth to protect that child has got to go through an enormous amount of trauma. And I don't think you need to be a psychiatrist or a psychologist to determine that.

Yet, the court's reliance on its own common sense is precisely the type of generalized assumption that *Coy* found inadequate to support a particularized finding of necessity to deny face-to-face confrontation. Reliance on such assumptions, if permitted, could justify denial of face-to-face confrontation in virtually any case involving a child's testimony against a parent, relative, or close acquaintance.

Furthermore, even assuming the court's reliance on general common sense were appropriate, the court never purported to find that the effect of the Blumes' presence on A.B.'s ability to testify would be more than *de minimus.* Instead, in context it appears that, since the court viewed the right to face-to-face confrontation as secondary, it believed that virtually any potential adverse effect on A.B.'s testimony would justify requiring the Blumes to remain outside the child's presence.

In conclusion, the evidence presented below did not establish that the effect of the Blumes' presence in the courtroom was likely to substantially inhibit A.B. in effectively communicating her version of events to the jury. Nor did the trial court so find. Although the fact that *Coy* and *Craig* had not yet been decided certainly renders understandable the trial court's decision to exclude the Blumes from the courtroom, in light of *Coy* and *Craig*, we must find that the court erred in doing so.

■ The state and the GAL contend on appeal that, at least as to Judy Blume, any error was harmless. The state points out that Judy Blume testified in her own defense and admitted inflicting many of the injuries suffered by J.G. The GAL points out that A.B.'s testimony at trial was not particularly helpful, and that much of the substantive evidence that led to conviction of the Blumes took the form of A.B.'s prior statements, which were introduced at trial as prior inconsistent statements. The state and the GAL argue that, under the circumstances, the Blumes' absence from the courtroom had no effect on the jury's finding of guilt.

We are unable to agree that the error in this case was harmless beyond a reasonable doubt. In considering the issue of harmless error, we may not speculate as to how A.B. might have testified had the Blumes not been excluded; rather, we must ignore A.B.'s testimony and rely only on the remaining evidence. *See Coy*, 487 U.S. at 1022, 108 S.Ct. at 2803. Here, A.B.'s testimony at trial was not wholly insubstantial. Moreover, her prior inconsistent statements were rendered admissible only by virtue of the fact that she testified. Were we to disregard the fact of A.B.'s testimony, we would have no basis for assuming that her prior inconsistent statements would have been admissible. Finally, it is conceivable that Judy Blume was prompted to testify by her daughter's testimony.

Under the circumstances, we cannot say beyond a reasonable doubt that the erroneous admission of A.B.'s testimony at trial had no effect on the jury's verdict. We conclude that the error was not harmless and that it requires reversal of the conviction.

The judgment is REVERSED.