Donald C. RENKEL, Appellant,

v.

STATE of Alaska, Appellee.

No. A–2518.

Court of Appeals of Alaska.

March 15, 1991.

Susan Orlansky, Asst. Public Defender, and John B. Salemi, Public Defender, Anchorage, for appellant.

Tonja Woelber, David Mannheimer, Asst. Attys. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Douglas B. Baily, Atty. Gen., Juneau, for appellee.

OPINION

Before BRYNER, C.J., COATS, J., and ANDREWS, District Court Judge.*

ANDREWS, Judge.

Donald Renkel was tried by jury and found guilty of six counts of sexual abuse of a minor in the first degree, AS 11.41.-

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

434(a)(2)(B), one count of sexual assault in the first degree, AS 11.41.410(3)(B), and three counts of sexual abuse of a minor in the second degree, AS 11.41.436(a)(3)(B).

Renkel appeals from these convictions on a number of grounds. We conclude that Renkel was denied his right to a public trial and reverse his conviction.

Renkel was charged with sexually abusing his three children between 1983 and 1986. The three children testified against Renkel at trial. At the time of trial, the children were eleven, twelve, and thirteen years old.

Before the trial began, the prosecutor requested that the courtroom be closed to the public while the children gave testimony. The prosecutor, in making the request, relied on AS 12.45.048, a previously enacted but apparently unutilized statute mandating courtroom closure. The statute provided:

> *Exclusion of public from trial during testimony by young victim of sexual offense.*
>
> (a) After notice to the defendant, the state may apply to the court for an order excluding the public from the courtroom during the testimony of a child who is the alleged victim of a violation of AS 11.41.410—11.41.455. The order shall be granted if the court finds that the child is 16 years of age or younger at the time of the trial.
>
> (b) If the public is excluded from the trial under (a) of this section, the testimony given during the time the public is excluded shall be available to the public upon request within a reasonable time sufficient to allow preparation of a tape recording or transcript of the testimony.
>
> (c) In this section "public" means all persons except
>
> (1) the judge presiding over the trial;
>
> (2) the members of the jury;
>
> (3) the defendant and the attorney and an investigator for the defendant;
>
> (4) the prosecuting attorney and an investigating officer for the state;
>
> (5) the parents or legal guardians of the child;
>
> (6) a guardian ad litem or attorney for the child;
>
> (7) in the discretion of the court, an adult for whom the child has developed a significant emotional attachment who can provide emotional support for the child while the child testifies;
>
> (8) court personnel, including those essential for taking the testimony.

The trial judge flatly denied the request, responding that, "We won't close the courtroom." Later in the proceedings, and out of the presence of the jury the judge, *sua sponte,* addressed the issue. He indicated that he had reread the statute cited by the prosecutor providing for courtroom closure. The relevant section stated that:

> After notice to the defendant, the state may apply to the court for an order excluding the public from the courtroom during the testimony of a child who is the alleged victim of a violation of AS 11.41.410—11.41.455. The order shall be granted if the court finds that the child is 16 years of age or younger at the time of the trial.

The judge stated that the statute required him to close the courtroom because both conditions of the statute had been satisfied: (1) the district attorney had requested closure, and (2) the child witnesses were all under age sixteen. He noted that the word "shall" appeared in the wording of the statute, leaving him no alternative but to exclude the public.

Defense counsel made a timely objection citing the defendant's constitutional right to a public trial. In response, the prosecutor urged that the courtroom be closed during the children's testimony because they were under tremendous stress in anticipation of the trial and would give more accurate testimony if shielded from the public eye. The judge did not hold a hearing on the issue of the particular need for closure in this case, the emotional or psychological condition of the children, or their ability to testify accurately in a public setting. Consequently, the trial judge made no findings for the record concerning any of these questions. Furthermore, the trial judge did not consider alternatives to clo-

sure which might have protected the welfare of the children while still allowing public access. The record is not clear as to whether the courtroom was closed for the entire trial or just during the testimony of the children. Renkel claims error whether the closure is deemed a complete or partial closure.

Renkel contends that he was improperly denied his right to a public trial as provided by the sixth amendment of the United States Constitution and article I, section 11 of the Alaska Constitution when the courtroom was closed. He argues that the judge committed error because the sole basis for closing the courtroom was a mandatory statute, unconstitutional on its face.

This court decides the nature of the defendant's right to a public trial under the United States and Alaska Constitutions. We begin our analysis with the basic rule that a criminal trial is a presumptively public proceeding. *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 514 n. 1, 104 S.Ct. 819, 826 n. 1, 78 L.Ed.2d 629 (1984). The fundamental nature of this conclusion is well-grounded in history and legal precedent. The United States Supreme Court has repeatedly drawn on this unbroken chain of authority in deciding several landmark cases in the last decade. *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979). Although these cases arise from public access claims grounded on first amendment principles, we can derive much from their teachings on the deeply rooted nature of the public trial right in Anglo–American jurisprudence and the critical function that a public trial serves in the administration of justice today.

From the historical perspective, there is little written about the public aspect of criminal trials. Historians conclude that this is so because the public nature of trials was so commonly known and accepted that its existence was not historically noteworthy. "[E]arly Anglo–Saxon laws 'deal rather with the novel and uncertain, than with the normal and undoubted rules of laws.... Why trouble to record that which every village elder knows?'" *Richmond Newspapers*, 448 U.S. at 565 n. 5, 100 S.Ct. at 2821 n. 5.

Documents dating from the sixteenth century describe the public aspect of trial, necessitated by the fact that jurors were drawn from those who assembled.[1] According to these early writings, the trial was held "[i]n the towne house, or in some open or common place." *Press–Enterprise Co.*, 464 U.S. at 506, 104 S.Ct. at 822, (citing T. Smith, *De Republica Anglorum* 96 (Alston ed. 1906)). Except for a written indictment, the remainder of the trial was historically held in public, as explained by T. Smith:

> 'All the rest is doone openlie in the presence of the Judges, the Justices, the enquest, the prisoner, and so manie as will or can come so neare as to heare it, and all depositions and witnesses given aloude, that all men may heare from the mouth of the depositors and witnesses what is saide.'

*Id.*

The function that a public trial serves has been eloquently detailed in the watershed case of *Richmond Newspapers, Inc.* where the Court determined that

> '[O]ne of the most conspicuous features of English justice, that all judicial trials are held in open court, to which the public have free access, ... appears to have been the rule in England from time immemorial.'

1. As noted by the court in *Press–Enterprise Co.*, 464 U.S. at 505, 104 S.Ct. at 821 (footnotes omitted):

> The roots of open trials reach back to the days before the Norman Conquest when cases in England were brought before "moots," a town meeting kind of body such as the local court of the hundred or county court. Attendance was virtually compulsory on the part of the freemen of the community, who represented the "patria," or the "country," in rendering judgment. The public aspect thus was "almost a necessary incident of jury trials, since the presence of a jury ... already insured the presence of a large part of the public."

*Richmond Newspapers,* 448 U.S. at 566–67, 100 S.Ct. at 2821–22, (citing E. Jenks, *The Book of English Law* 73–74 (6th ed. 1967)).

The Court then concluded:

We have found nothing to suggest that the presumptive openness of the trial, which English courts were later to call "one of the essential qualities of a court of justice," *Daubney v. Cooper,* 10 B. & C. 237, 240, 109 Eng.Rep. 438, 440 (K.B. 1829), was not also an attribute of the judicial systems of colonial America.

*Id.* at 567, 100 S.Ct. at 2822.

In summing up the historical evidence, Chief Justice Burger found "conclusively that at the time when our organic laws were adopted, criminal trials both here and in England had long been presumptively open. This is no quirk of history; rather it has long been recognized as an indispensable attribute of an Anglo–American trial." *Id.* at 569, 100 S.Ct. at 2823.

The *Richmond* court in tracing the historical antecedents of the public trial in Anglo jurisprudence stated

The early history of open trials in part reflects the widespread acknowledgement, long before there were behavioral scientists, that public trials had significant community therapeutic value. Even without such experts to frame the concept in words, people sensed from experience and observation that, especially in the administration of criminal justice, the means used to achieve justice must have the support derived from public acceptance of both the process and its results.

When a shocking crime occurs, a community reaction of outrage and public protest often follows. Thereafter the open processes of justice serve an important prophylactic purpose, providing an outlet for community concern, hostility, and emotion. Without an awareness that society's responses to criminal conduct are underway, natural human reactions of outrage and protest are frustrated and may manifest themselves in some form of vengeful "self-help," as indeed they did regularly in the activities of vigilante "committees" on our frontiers.

"The accusation and conviction or acquittal, as much perhaps as the execution of punishment, operat[e] to restore the imbalance which was created by the offense or public charge, to reaffirm the temporarily lost feeling of security and, perhaps, to satisfy that latent 'urge to punish.' "

Civilized societies withdraw both from the victim and the vigilante the enforcement of criminal laws, but they cannot erase from people's consciousness the fundamental, natural yearning to see justice done—or even the urge for retribution. The crucial prophylactic aspects of the administration of justice cannot function in the dark; no community catharsis can occur if justice is "done in a corner [or] in any covert manner." It is not enough to say that results alone will satiate the natural community desire for "satisfaction." A result considered untoward may undermine public confidence, and where the trial has been concealed from public view an unexpected outcome can cause a reaction that the system at best has failed and at worst has been corrupted. To work effectively, it is important that society's criminal process "satisfy the appearance of justice" and the appearance of justice can best be provided by allowing people to observe it.

448 U.S. at 570–72, 100 S.Ct. at 2823–25 (citations omitted). In addition to a prophylactic or therapeutic effect, the public trial holds strong educational value.

"The educative effect of public attendance is a material advantage. Not only is respect for the law increased and intelligent acquaintance acquired with the methods of government, but a strong confidence in judicial remedies is secured which could never be inspired by a system of secrecy. 6 Wigmore, *supra,* at 438. (citation omitted.)"

*Id.* at 572, 100 S.Ct. at 2825.

Finally and importantly, openness fosters acceptance not just of the decision rendered, but of the institution itself.

People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what

they are prohibited from observing. When a criminal trial is conducted in the open, there is at least an opportunity both for understanding the system in general and its workings in a particular case[.]

*Id.*

Despite the fundamental nature of the right to public trial and the vital function it still serves, it is well accepted that the right is not absolute. *Globe Newspaper Co.*, 457 U.S. at 606, 102 S.Ct. at 2619. It may be limited by some other overriding interest. *Richmond Newspapers*, 448 U.S. at 581 n. 18, 100 S.Ct. at 2830 n. 18.

The federal courts have approved limited or partial closures of a criminal proceeding under a variety of circumstances.[2] *See Nieto v. Sullivan*, 879 F.2d 743, 753 (10th Cir.1989) (exclusion of the defendant's relatives only during the victim's testimony was justified in order to protect the victim who was afraid of testifying); *United States v. Sherlock*, 865 F.2d 1069, 1077 (9th Cir.1989) (exclusion was justified when the alleged rape victim was frightened of the defendant's family members and was apprehensive about testifying in front of them and where judge excluded the family members from the courtroom during her testimony); *Douglas v. Wainwright*, 714 F.2d 1532 (11th Cir.1983), *vacated*, 468 U.S. 1212, 104 S.Ct. 3580, 82 L.Ed.2d 879 (1984), *reaffirmed* in *Douglas v. Wainwright*, 739 F.2d 531 (11th Cir.1984) (closure was justified where the public was excluded during the embarrassing testimony of the alleged victim of sexual assault, who was also the only eyewitness to an alleged murder, but where the press and the defendant's family were allowed to remain); *United States v. Hernandez*, 608 F.2d 741, 748 (9th Cir. 1979) (exclusion of all spectators during the testimony of a key witness was justified when evidence was presented that the life of the witness and his family had been threatened); *United States ex rel. Latimore v. Sielaff*, 561 F.2d 691, 694 (7th

Cir.1977) (exclusion of all disinterested spectators from the courtroom during the testimony of a rape victim did not violate the defendant's public trial right where the judge allowed the press to remain); *United States v. Akers*, 542 F.2d 770, 772 (9th Cir.1976) (spectators were excluded to maintain order in the courtroom during the return of the verdicts); *United States ex rel. Lloyd v. Vincent*, 520 F.2d 1272 (2nd Cir.1975) (limited exclusion was justified protection of the identity of an undercover agent who was called to testify); *Stamicarbon, N.V. v. American Cyanamid*, 506 F.2d 532 (2nd Cir.1974) (spectator could be excluded to protect trade secrets); *United States ex rel. Bruno v. Herold*, 408 F.2d 125, 128 (2nd Cir.1969) (defendant was not denied his public trial right when all spectators were excluded from the first day of a two-day trial, since the judge determined that these spectators were likely to undermine the orderly trial and deter truthful testimony and the prosecution's sole identification witness was terrified of the spectators); *United States ex rel. Morgan v. Lane*, 705 F.Supp. 410 (N.D.Ill.1989) (partial closure upheld where disinterested spectators were excluded but the defendant's family and media members were allowed to remain).

The ambiguous language of the cases reviewing the decision of the trial judge to close the courtroom doors complicates the task of categorizing these cases or deriving bright-line rules from their holdings. The courts variously use the term partial or limited closure to refer to an order that might exclude a portion of the public from an entire criminal proceeding or exclude all of the public from a select part of the criminal proceeding. It is unnecessary to lead the reader through this maze in order to reach the general rule that can be distilled from this exercise.

 The general rule, as we view it, is that the broader the closure order becomes,

---

**2.** The territorial courts of Alaska applied limited closure orders in several criminal cases in which the defendant was charged with rape involving juvenile victims. Those closures were upheld by the Ninth Circuit. *Geise v. United States*, 262 F.2d 151, 157 (9th Cir.1958); *Callahan v. United States*, 240 F. 683 (9th Cir.1917); *Reagan v. United States*, 202 F. 488 (9th Cir. 1913).

the more compelling the interest sought to be protected must be. Concomitantly, each closure, whether limited or complete, whether based on substantial justification or overriding compelling interest, must be made sparingly on a case-by-case basis in which the judge carefully balances the right of public trial against the interests to be protected by the closure. 3 W. LaFave, *Criminal Procedure* § 23.1, at 2–5 (1984). The more recent United States Supreme Court cases of *Globe Newspaper Co., Press–Enterprise Co.,* and *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) set forth the specific requirements for total and partial closures alike:[3] 1) that findings be made so that the record supports the legitimate reason for closure; 2) that alternatives must be considered prior to closure; and 3) that the judge fashion

the closure order to be no broader than necessary to suit the purpose. *See Waller,* 467 U.S. at 47, 104 S.Ct. at 2215; *Press–Enterprise,* 464 U.S. at 510, 104 S.Ct. at 824.

With these guiding principles in mind, we turn to the particular facts of Renkel's case.

■ At the outset, we note that the state concedes the unconstitutionality of AS 12.-45.048. The statute is indistinguishable from the Massachusetts mandatory closure statute which the United States Supreme Court found unconstitutional. *See Globe Newspaper Co.,* 457 U.S. at 607–11, 102 S.Ct. at 2620–23.[4]

The state admits the mandatory Alaska statute shares the same constitutional infirmities of the Massachusetts statute.[5]

**3.** A number of courts have suggested that the best procedure in the trial court would be to hold a hearing for fact gathering on the issues. *Hernandez,* 608 F.2d at 748; *Sielaff,* 561 F.2d at 696; *Vincent,* 520 F.2d at 1276.

**4.** The Massachusetts law was faulty for a number of reasons. It did not require a determination that closure was necessary based on relevant factors: the age of the child witness, psychological maturity, nature of the crime, the interests of parents and relatives, the wishes of the victim, and the victim's ability and willingness to testify. The statute did not require the court to weigh the need of the child based on these factors, against the constitutional right of the defendant to have a public criminal trial. *Id.* at 609. The closure order could not, therefore, be viewed as a measure which is narrowly tailored to serve a legitimate state interest in protecting the welfare of a child witness of sex crimes. *Id.*

**5.** The historical antecedents of AS 12.45.048 are especially noteworthy in light of the action this court is compelled to take today.

The senate bill that preceded AS 12.45.048, designated SB 547, was approved by the senate on February 2, 1982. The corresponding house bill, HB 576, was approved by the house on May 6, 1982. Alaska Statute 12.45.048 was signed into law by the governor on May 28, 1982, to go into effect on August 26, 1982.

On March 29, 1982, however, the Supreme Court of the United States heard arguments in the case of *Globe Newspaper Co.* concerning the constitutionality of the Massachusetts mandatory closure statute which was nearly identical to that in the proposed Alaska bills. On June 23, 1982, the Court published its decision in the case, holding that the mandatory closure statute

infringed on the constitutional right to a public trial, and thus violated the first amendment.

Upon examination of the materials available to the judicial committees of both legislative houses, it is clear that the members of those committees were well aware that *Globe Newspaper Co.* was pending and that the constitutionality of mandatory closure was in question.

For example, in a senate judicial committee meeting on January 29, 1982, Victor Krumm, a state prosecutor, was present and suggested that the bill be changed to provide for discretionary rather than mandatory closure. Alaska Legislature Committee Files Micro Fiche numbers 1699–1700, 1981–82. The Alaska Network on Domestic Violence and Sexual Assault also mentioned to the committee the possibility of constitutional attack in a position paper on Senate Bills 547 and 487. According to handwritten notes taken at the senate meeting, the pending *Globe* decision was mentioned and discussed by the committee.

Furthermore, supplemental materials were made available to the members of the committees relevant to the issue of constitutionality of mandatory closure statutes. Members were provided copies of an article from the *National Law Journal* discussing the *Globe* case. The article stated that the central issue before the Supreme Court was the constitutionality of a mandatory closure Massachusetts law. Finally, the committee members looked at the Massachusetts law in question, as well as similar mandatory closure laws from Florida and New Mexico. Nonetheless, AS 12.45.048 became effective law approximately sixty days after virtually identical legislation had been declared unconstitutional by the United States Supreme Court.

This court is unaware of any criminal case in which this statute, constitutionally infirm since its enactment in 1982, was applied.

Our acceptance of the state's confession of unconstitutionality does not end the analysis. We consider whether the closure can be justified without relying on the unconstitutional statute.

■ Unfortunately, the factual record on the timing of the closure is unclear. The request for closure during the testimony of the children was made prior to opening statements. Between the testimony of the first two adult witnesses, the judge announced that after rereading the statute, he determined that he was compelled to close the courtroom in conformity with the demands of the statute. It is clear, at the very least, that the general public, including the press, was excluded during the testimony of all three minor children.

The first question is whether the exclusion during the testimony of the three children qualifies as a total or partial closure. The key question is whether the "public nature" of the trial was preserved in Renkel's case or whether it was the type of "secret trial" which the public trial right was intended to prevent. *Douglas*, 714 F.2d at 1538.

In Renkel's trial, the judge followed the mandates of AS 12.45.048 which permitted the admission of the defendant, the judge, the jury, the witness, and the parents or legal guardians of the children. The press, disinterested spectators, and any friends or relatives of Mr. Renkel were excluded pursuant to AS 12.45.048. The children's foster father was present during the testimony of at least two of the three minor children. Apparently no other spectators were given access. Except that a transcript could be made public upon request, it appears that none of the safeguards of an open trial were maintained. The closure in Renkel's case was, therefore, "total" in the sense that it was closed to all spectators, and could be upheld only with the advance-

ment of a compelling interest supported by findings in the record.

Even if the closing was partial rather than total, the order had to be based on particularized findings. *Globe Newspaper Co.,* 457 U.S. at 607–08, 102 S.Ct. at 2620–21. The state admitted that the court made no findings and that the order was entered pursuant to a mandatory closure statute which was constitutionally flawed.

The state argues that this fatal infirmity can be cured by a remand to the trial judge to allow him to make the necessary findings to conform to the dictates of *Globe Newspaper Co..* We disagree.

■ This court has combed the record to determine if there is a sufficient factual record, taken in the light most favorable to the state, to justify a remand, assuming for the sake of argument, that remand under these facts is legally permissible.[6] We find the record wholly inadequate to support a remand. The record discloses only two factual items. First, a letter from the youngest child's therapist was offered. The therapist predicted significant emotional damage would occur if the child was required to testify at all. The doctor suggested videotaped testimony in lieu of a court appearance. Further, the guardian ad litem for the children, in an offer of proof, told the court that all the minor witnesses were under:

> [A] great deal of emotional stress at this time, that the purpose of their testimony is to ... determine the truth in this matter and by not having the public present, I think that there's a greater likelihood that the children will be able to give the accurate rendition of the facts. To place upon them additional emotional stress will in all likelihood be of such a degree that it will make it extremely difficult for them to testify.

To complete the historical circle we note that the Alaska legislature, during its 1988 session, apparently recognizing the problems with AS 12.45.048, replaced it with AS 12.45.046, a court closure statute that requires the type of detailed findings mandated by the Supreme Court in *Globe Newspaper Co..*

6. Renkel argues that *Waller,* 467 U.S. at 48 n. 8, 104 S.Ct. at 2216 n. 8 and *United States v. Brooklier,* 685 F.2d 1162, 1169 (9th Cir.1982), suggest that rationalizations by the trial court after the fact are legally insufficient under *Globe Newspaper Co..* We decline to address the question in light of our findings on the insufficiency of the record.

██ This court is not unmindful of the tremendous emotional burden that children face while testifying in these particularly difficult cases. Nonetheless, the clear holdings of *Craig v. Maryland,* — U.S. —, 110 S.Ct. 3157, 3167, 111 L.Ed.2d 666 (1990), *Coy v. Iowa,* 487 U.S. 1012, 1021, 108 S.Ct. 2798, 2803, 101 L.Ed.2d 857 (1988) and *Globe Newspaper Co.,* 457 U.S. at 608–609, 102 S.Ct. at 2620–21, require case specific evidence to provide the special protection sought by the state. Generalized subjective impressions cannot substitute. *Blume v. State,* 797 P.2d 664, 674 (Alaska App.1990). The therapist's letter and the guardian ad litem's statement, even with the addition of the trial court's cognizance of the hesitant testimony of the youngest victim, could not provide facts sufficient to meet the requirements of *Globe Newspaper Co..*

> [T]he measure of the State's interest lies not in the extent to which minor victims are injured by testifying, but rather in the incremental injury suffered by testifying *in the presence of the press and the general public.*

457 U.S. at 607 n. 19, 102 S.Ct. at 2620 n. 19.

In this case there is not a contemporaneous factual record sufficient to clarify the rulings on remand. *Burks v. State,* 748 P.2d 1178, 1181 (Alaska App.1988). The state has cited no post-*Globe* authority to support its contention that remand is a viable remedy.

The only remedy available to this court is reversal. This is so even in the absence of a specific claim of prejudice flowing from the closure. The Alaska Supreme Court

determined in a case involving a closed juvenile criminal trial that "[w]here the right [to public trial] has been denied, no prejudice need be shown, since such a showing would be almost impossible to make." *R.L.R. v. State,* 487 P.2d 27, 36–37 (Alaska 1971) (citing *United States v. Kobli,* 172 F.2d 919 (3rd Cir.1949) and *Tanksley v. United States,* 145 F.2d 58 (9th Cir. 1944)). The United States Supreme Court in *Waller* noted:

> The parties do not question the consistent view of the lower federal courts that the defendant should not be required to prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee. We agree with that view.

467 U.S. at 49, 104 S.Ct. at 2217 (footnote omitted). Prejudice need not be proved because there is "no way to gauge the great, though intangible, societal loss that flows from the frustration of" the goal of the public confidence which occurs when the courthouse doors are closed. *People v. Jones,* 47 N.Y.2d 409, 418 N.Y.S.2d 359, 364, 391 N.E.2d 1335, 1340 (N.Y.1979).

Having determined the fundamental nature of the right to an open courtroom and its clear violation in this case, this court must REVERSE the conviction. The case is REMANDED for a new trial.[7]

---

**7.** In addition to his public trial claim, Renkel asserted a denial of his right to confrontation and error on evidentiary and sentencing matters. Renkel claims that due to a specially modified arrangement of table and chairs for the juvenile witnesses, he could only view the profile or back of two of the three children. Renkel contends that the lack of full frontal face-to-face view of the witnesses denied him his constitutional right to confrontation. We decline to decide this issue for several reasons. First, there is an inadequate factual record on the exact nature of the physical arrangements. The parties have submitted irreconcilable diagrams and conceded at oral argument that the record

is factually inadequate. Second, our resolution of this issue is unnecessary due to our conclusion that the deprivation of Renkel's right to public trial mandates reversal. Finally, since the trial of this case, the United States Supreme Court has spoken on the subject in *Coy,* 487 U.S. 1012, 108 S.Ct. 2798, and we have addressed confrontational concerns in *Blume,* 797 P.2d 664. We believe that these cases provide sufficient guidance to the trial court should the issue arise.

Additionally, we decline to decide the evidentiary and sentencing related claims of error because resolution of those claims is unnecessary given our decision to reverse.