David C. REUTTER, Appellant,

v.

STATE of Alaska, Appellee.

No. A–4889.

Court of Appeals of Alaska.

Dec. 9, 1994.

William E. Olmstead, Olmstead & Conheady, Juneau, for appellant.

Nancy R. Simel, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

BRYNER, Chief Judge.

David C. Reutter was convicted by a jury of one count of sexual abuse of a minor in the first degree, AS 11.41.434(a)(1), and one count of sexual abuse of a minor in the second degree, AS 11.41.436(a)(2). The convictions stemmed from Reutter's sexual abuse of his nine-year-old daughter, A.R. At trial, over Reutter's objection, Superior Court Judge Larry C. Zervos permitted A.R. to testify via one-way closed-circuit television from a room adjacent to the courtroom. Reutter appeals, contending that this arrangement violated his constitutional right to confrontation. We affirm.

### FACTS

1. *Background Facts*

On February 15, 1992, Reutter locked A.R. out of their house in Sitka. The Division of Family and Youth Services (DFYS) became involved and placed A.R. and her mother, Patti Reutter, in a local women's shelter operated by Sitkans Against Family Violence (SAFV). Patti eventually returned home to Reutter. DFYS removed A.R. from the shelter and placed her in a foster home.

While A.R. was staying at the shelter, and afterwards while staying at the foster home, she attended support-group sessions at the SAFV shelter for child victims of domestic violence. During one of the support-group sessions, A.R. told Elizabeth Willis,[1] the children's program coordinator and A.R.'s "child advocate," about Reutter's sexual abuse. Willis immediately notified DFYS. A.R.'s case was assigned to DFYS social worker Sandra Beare–Spencer, who reported the allegations of sexual abuse to the Sitka police and arranged for A.R. to be physically examined by Sitka family practitioner Dr. Debra Pohlman. Pohlman found that A.R. had a larger than normal vaginal opening and that she had scarring in the area, both signs of

---

1. Throughout the proceedings Willis was also referred to by her former married name, Eliza- beth Sayer or Elizabeth Willis Sayer.

sexual abuse. The state then filed a Child In Need of Aid (CINA) petition to determine the most appropriate custodial placement for A.R.

### 2. *The CINA Hearing*

A.R. was placed with relatives in Chevak pending the CINA determination. She returned to Sitka in May to testify at the CINA hearing. When A.R. first entered the courtroom to testify, she appeared confident and very happy to see her parents. However, during her testimony, she became anxious and distracted by stares and smiles from her parents and by the whispering and conferring between her parents and their attorneys. Soon, A.R.· simply "shut down." The court was forced to recess, and A.R. had to be taken from the courtroom. According to Beare–Spencer, A.R. became "[v]ery, very upset. Her face contorted[,] . . . her eyebrows were together and . . . her arms were tight in front of her, and she was leaning against a wall and just shaking. She . . . was extremely upset." A.R. told Beare–Spencer that "she couldn't talk about what happened, that her mom was going to be hurt, that her dad would hurt her mom."

Later, the court attempted to take A.R.'s testimony by placing her in the district attorney's office with just Willis and her guardian *ad litem*, Mary Hughes; the assistant attorney general who was handling the CINA proceeding questioned her by telephone from the courtroom. However, the electronic equipment in the district attorney's office malfunctioned, causing A.R. to become even more upset. The hearing was postponed for several days. When it reconvened, A.R. was placed in a grand jury room, again with just Willis and Hughes present in the same room. From there, she was able to answer some questions over the speakerphone, but she still refused to testify regarding the sexual abuse.

### 3. *Pretrial Hearing*

On May 8, 1992, the same day the CINA hearing began, Reutter was indicted for sex-

ually abusing A.R. Prior to trial, the state moved, pursuant to AS 12.45.046(a)(2), to have A.R. be allowed to testify via one-way closed-circuit television or through one-way mirrors. Reutter opposed on confrontation clause grounds. Judge Zervos conducted a two-day evidentiary hearing to determine whether A.R. should be permitted to testify without actually confronting Reutter. At the hearing, the state presented testimony from Beare–Spencer, Willis, Jan Rutherdale (the assistant attorney general who had handled the CINA proceeding), and Martha Ann Lyman (the mental health clinician who treated A.R. while she was staying in Chevak). In addition, Judge Zervos considered a psychological evaluation of A.R. that had been written by Dr. Christiane Brems of the Yukon–Kuskokwim Mental Health Center.

In the course of the hearing, Reutter questioned the qualifications of each of the state's witnesses to testify as experts on the issue of whether A.R. should be allowed to testify without confronting Reutter. Judge Zervos overruled the objections and allowed the witnesses to testify.

Beare–Spencer, the DFYS social worker assigned to A.R.'s case, indicated that she had worked as a social worker for DFYS in Sitka for five years. She had a bachelor's degree in sociology and was only eighteen hours away from receiving a master's degree from Boise State University. She testified that her primary responsibility at DFYS was "protecting children from physical or emotional harm" and that, when making decisions regarding when to intervene, she relied primarily on the on-the-job training and experience that she received, first in Idaho, and then in Sitka.

Beare–Spencer testified that she had spent "[q]uite a bit" of time with A.R. and had talked to her often on the telephone in the previous six months and that she had even spent "four solid days with her" while they traveled to Chevak together. She testified that she knew "a lot of who [A.R.] is," but that there was a part of A.R. that she did not know because A.R. "closes down" when she

becomes upset. When asked whether she believed A.R. could testify in the presence of Reutter, she answered: "She can't do it." Beare–Spencer based her answer on her observations of A.R.'s emotional condition during and after the CINA proceeding and on A.R.'s statement to Beare–Spencer regarding her desire to protect her mother by remaining silent. Reutter objected, on hearsay grounds, to Beare–Spencer's testimony concerning A.R.'s statement. Judge Zervos overruled the objection.

The prosecution also asked Beare–Spencer whether, in her opinion, "Reutter's presence would significantly impair the substance of [A.R.'s] testimony if she were forced to testify." Reutter objected, arguing that the witness did not have the psychological expertise to testify regarding "this child's psyche." Judge Zervos overruled the objection, and Beare–Spencer testified that she did not believe that A.R. could testify in an open courtroom.

Next, Elizabeth Willis, A.R.'s child advocate, testified. Willis testified that, prior to becoming a child advocate in Sitka, she completed "early childhood trainings" and had taken many classes and workshops in psychology. In addition, she testified that she operated a day-care business for five years in Anchorage before she moved to Sitka. She testified that she and A.R. developed a trusting relationship soon after A.R. arrived at the SAFV shelter and that they thereafter exchanged letters. Willis had accompanied A.R. at the previous CINA hearing.

Willis was asked whether, in her opinion, A.R. would be able to testify in the presence of her father. Reutter again objected for lack of expert qualification. The court again overruled the objection. Willis stated that she believed that A.R.'s ability to effectively communicate would be affected by Reutter's presence in the courtroom. She based her opinion on A.R.'s statements after the CINA hearing that she was unable to talk because Reutter had been staring and smiling at her and whispering about her. Again, Reutter objected on hearsay grounds, but was overruled.

Jan Rutherdale, the state's CINA counsel, testified next. Rutherdale stated that, for the previous three and one-half years, she had been employed by the attorney general's office in Juneau, exclusively handling child-in-need-of-aid and juvenile-delinquency matters. Prior to becoming an assistant attorney general, she had worked as an assistant public defender in Juneau. In the years of her practice, she testified, she had interviewed roughly twenty children. Over Reutter's objection, the trial court found Rutherdale to have substantial expertise in the behavior of witnesses; the court also indicated that Rutherdale was qualified to testify about A.R.'s conduct at the CINA hearing—"what happened on the days in question."

Rutherdale testified that she first met A.R. the evening before the CINA hearing. On the morning of the CINA hearing, A.R. seemed to be "friendly" and "bouncy," but a little immature. Rutherdale recalled that A.R. did not appear to be too shy to testify, that she was happy to see her parents, and that she was able to answer some preliminary questions. She testified that A.R. soon became distracted by her parents and was unable to continue. The first question that A.R. was unable to answer was "[Do you] remember the night that you were removed from your house?" Again over Reutter's objection, Rutherdale testified that, based on her previous experience with and observations of A.R. in the courtroom and on questions that A.R. asked her about the conduct of her parents during the proceeding, Rutherdale did not think that A.R. would testify in Reutter's presence: "[S]he was just so affected by his presence. I mean, ... it was like her attention to me evaporated and—and all she could think about or ... react to was her father." She testified that A.R. asked her in a whispered voice why her parents were talking to each other during her testimony.

Rutherdale further testified that A.R. had been a very isolated child, that the Reutters had restricted her movement considerably, and that the particular dynamics of her family "may make it impossible for her to testi-

fy." She stated that she did not know whether A.R. would ever be able to testify to the sexual abuse under any circumstances. When asked by the trial court whether A.R. would be able to testify in the presence of Reutter if the testimony occurred outside a formal courtroom setting, Rutherdale responded: "[T]he problem with getting Mr. Reutter and her in a small room, I think that might almost be worse."

Next, the trial court requested that Martha Ann Lyman be called to testify telephonically. She testified that, as a mental health clinician in the Yukon–Kuskokwim delta region, she treated A.R. for three sessions during A.R.'s stay in Chevak. She testified that A.R. was very bright, but guarded and distrustful. She stated that she thought A.R. should not be forced to testify in the presence of Reutter because she would not feel safe doing so, she would suffer emotional harm, and she would not "be able to give a real open testimony in front of her father."

In addition to the foregoing testimony, Judge Zervos considered the psychological evaluation of A.R. that had been submitted by Dr. Brems. Brems' report stated that A.R. "currently functions in the low average range of intelligence," but that this level of function "may be largely explained by her academic deprivation." Brems concluded that A.R. exhibited "strong traits of a borderline personality disorder"; and Brems summarized the results of her evaluation as follows:

> [T]his is a child who has been severely traumatized and whose sexual trauma has resulted in clear implications for all areas of functioning. Specifically it is likely that her social, academic, and psychological deprivation have interfered with her cognitive and perceptual-motor development. With regard to intrapsychic functioning, her coping is impaired and she has difficulty controlling affect and behavior. She tends to isolate herself from others to avoid being overwhelmed by her own needs which would result in acting out. Hence, she initiates a vicious cycle of iso-

lation and lack of nurturance in her own life. Her view of the world is largely hostile and unpredictable, leaving her in a conflict, as she also has very strong dependency and security needs.

Finally, prior to issuing his written decision on the state's motion to allow A.R. to testify by closed-circuit television, Judge Zervos reviewed a tape recording of the previous CINA proceeding.

Judge Zervos ultimately granted the state's motion to take A.R.'s testimony via closed-circuit television. In a written order issued on August 11, 1992, the judge set out specific findings and conclusions in support of the decision. Specifically, in conclusion number six of the decision, Judge Zervos stated:

> It is clear that [A.R.] will not testify because of fear, guilt or severe psychological distress. It is also clear that [A.R.'s] failure to testify is due, in large part, to the presence of her father. Therefore, under the statutes and the case law the confrontation clause must give way in the most minimal way possible. Allowing the child's testimony to be taken outside of the defendant's presence may facilitate the child's ability to testify. Denying the request to take the testimony outside the defendant's presence, based in [sic] past attempts, guarantees the child's silence.

#### 4. Trial

At the time of trial, Judge Zervos finalized the arrangements for A.R.'s testimony. A.R. testified from a separate room adjacent to the courtroom. In the room with A.R. were the videocamera operator, the prosecutor, Reutter's counsel, and A.R.'s guardian *ad litem*, Mary Hughes; Hughes, who was to provide moral support for A.R., remained out of the camera's focus. Reutter was given the option of observing A.R. from a third room, outside the presence of both A.R. and the jury. He elected instead to remain in the courtroom, so that the jury could observe his reaction to A.R.'s testimony. Reutter had continuous access to his attorney by a telephone connected to the room from which

A.R. testified.[2]

Although Reutter preserved a general, continuing objection to the taking of A.R.'s testimony via one-way closed-circuit television, he indicated that he did not object to the specific procedure outlined above.

The state called A.R. to testify as its first witness. Before A.R. testified, the trial court instructed the jury as follows:

Ladies and gentlemen, what we're going to do next is a little unusual. As you'll see for the rest of the trial, most all witnesses will always testify in this chair here. But the parties have decided, both the prosecution and the defense, that because of the age of [A.R.] and of twelve strangers and me sitting up here in this black robe, it may be less disconcerting to her to take the testimony in another room in a closed circuit kind of TV arrangement.

She will be testifying live and we'll be able to witness everything. Of course, you can watch her as she testifies on these monitors. [The attorneys] will be in the room asking questions of her.

On direct examination, A.R. testified that her father had touched her "in [her] privates" on several occasions and that he "made [her] touch his private part." She testified that, in February, her father had "pulled up" on her "privates," making them bleed. She testified that her father had told her, "Don't tell no one" and that he would "hurt" her if she did tell someone. A.R. testified that, although she did not tell anyone, her father hurt her anyway.

During a break between direct and cross-examination, Reutter encountered A.R. in the hallway and said, "Hi, [A.R.], hi, honey, I love you." Since such direct contact had been forbidden by the court under the previously issued CINA order, Judge Zervos admonished Reutter not to let it happen again.

Cross-examination was eventually postponed until the day after direct examination was completed, since only fifteen minutes remained in the trial day and Reutter decided that he would rather start fresh the next morning.

Before proceedings commenced the next morning, the prosecutor reported that Patti Reutter had intercepted A.R. after trial the previous day and had whispered, "Don't say nothing," and "Daddy loves you, Daddy loves you." The trial court admonished Patti Reutter not to interfere with A.R.'s testimony and not to have any contact with her inside the courthouse building. Then, after a short recess, the prosecutor reported:

[A.R. is] in my office, basically in tears, refuses to come forward. She's basically locked in the office at this point so she just doesn't run away.

The reason being as they—she arrived this morning with Ms. Willis, I mean, essentially she was a little nervous as we expected her to be. As Mr. and Mrs. Reutter took a seat in the hallway they saw each other, they were waving back and forth. And as Ms. [Willis] and Ms. Hughes would actually testify to, you could just see her just, the term is shut down. And now she is basically sitting on the floor, refuses to budge, period.

A.R. nevertheless eventually did testify on cross-examination.

## DISCUSSION

In moving for an order allowing A.R. to testify by closed-circuit television outside Reutter's physical presence, the state relied on AS 12.45.046. This statute permits the trial court to order the testimony of a child to be communicated to the jury and the defendant by closed-circuit television, but only in exceptional cases, and only upon a case-spe-

---

**2.** The trial court indicated that it would declare a recess any time Reutter wished to confer with his attorney. Objections by either attorney would be handled in the same way; the court would declare a recess and discuss the objection outside the presence of the jury. The trial court instructed the attorneys not to make objections and arguments while the videotape was running, but to request an immediate hearing.

cific showing of actual necessity.[3] For such testimony to be received, the accused must be charged with an assault under chapter 41 of the Alaska Revised Criminal Code. AS 12.45.046(a). The crime charged must involve a victim or witness who is under the age of thirteen; the proposed witness must be either the alleged child-victim or the child-witness. *Id.* In such cases, the court may order testimony to be taken by closed-circuit television, "if the court determines that the testimony by the child victim or witness un-

der normal court procedures would result in the child's inability to effectively communicate." AS 12.45.046(a)(2).

On appeal, Reutter contends that, on its face, AS 12.45.046 violates the confrontation clauses of the federal and Alaska constitutions. Alternatively, Reutter maintains that the application of this statute in his case resulted in a violation of his right to confrontation under both constitutions. Reutter lastly claims that the manner in which the

**3.** The full text of AS 12.45.046 is as follows:

**Testimony of children in criminal proceedings.**
(a) In a criminal proceeding under AS 11.41 involving the prosecution of an offense committed against a child under the age of 13, or witnessed by a child under the age of 13, the court

(1) may appoint a guardian ad litem for the child;

(2) on its own motion or on the motion of the party presenting the witness or the guardian ad litem of the child, may order that the testimony of the child be taken by closed circuit television or through one-way mirrors if the court determines that the testimony by the child victim or witness under normal court procedures would result in the child's inability to effectively communicate.

(b) In making a determination under (a)(2) of this section, the court shall consider factors it considers relevant, including

(1) the child's chronological age;

(2) the child's level of development;

(3) the child's general physical health;

(4) any physical, emotional or psychological injury experienced by the child; and

(5) the mental or emotional strain that will be caused by requiring the child to testify under normal courtroom procedures.

(c) If the court determines under (a)(2) of this section that the testimony by the child victim or witness under normal court procedures would result in the child's inability to effectively communicate, the court may order that the testimony of the child be taken in a room other than the courtroom and be televised by closed circuit equipment in the courtroom to be viewed by the defendant, the court, and the finder of fact in the proceeding. If the court authorizes use of closed circuit televised testimony under this subsection,

(1) each of the following may be in the room with the child when the child testifies:

(A) the prosecuting attorney;

(B) the attorney for the defendant; and

(C) operators of the closed circuit television equipment;

(2) the court may, in addition to persons specified in (1) of this subsection, admit a person whose presence, in the opinion of the court, contributes to the well-being of the child.

(d) When a child is to testify under (c) of this section, only the court and counsel may question the child. The persons operating the equipment shall do so in as unobtrusive a manner as possible. If the defendant requests, the court shall excuse the defendant from the courtroom, shall permit the defendant to attend in another location, and shall afford the defendant a means of viewing the child's testimony and of communicating with the defendant's attorney throughout the proceedings. Upon request of the defendant or the defendant's attorney, the court shall permit a recess to allow them to confer. The court shall provide a means of communicating with the attorneys during the questioning of the child. Objections made by the attorneys to questions of a child witness may be resolved in the courtroom if the court finds it necessary.

(e) If the court determines under (a)(2) of this section that the testimony by the child victim or witness under normal court procedures would result in the child's inability to effectively communicate, the court may authorize the use of one-way mirrors in conjunction with the taking of the child's testimony. The attorneys may pose questions to the child and have visual contact with the child during questioning, but the mirrors shall be placed to provide a physical shield so that the child does not have visual contact with the defendant and jurors.

(f) If the court does not find under (a)(2) of this section that the testimony by the child victim or witness under normal court procedures will result in the child's inability to effectively communicate, the court may, after taking into consideration the factors specified in (b) of this section, supervise the spatial arrangements of the courtroom and the location, movement, and deportment of all persons in attendance so as to safeguard the child from emotional harm or stress. In addition to other procedures it finds appropriate, the court may

(1) allow the child to testify while sitting on the floor or on an appropriately sized chair;

(2) schedule the procedure in a room that provides adequate privacy, freedom from distractions, informality, and comfort appropriate to the child's developmental age; and

(3) order a recess when the energy, comfort, or attention span of the child warrants.

questioning of A.R. occurred separately violated his constitutional right to due process.

1. *Constitutionality of AS 12.45.046*

A. Applicable Constitutional Standard

The confrontation clause of the sixth amendment to the United States Constitution guarantees that "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." [4] In *Coy v. Iowa,* 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), the United States Supreme Court held that the federal constitution's confrontation clause protects not only the right to effective cross-examination but also the right to a face-to-face confrontation between the accuser and the accused. *Coy* left open the question of whether the right of face-to-face confrontation was absolute. *Id.* at 1021, 108 S.Ct. at 2803.

The Court answered this question two years later in *Maryland v. Craig,* 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). *Craig* holds that the right to literal confrontation is not absolute. Rather, in exceptional cases, the right may be required to yield in order to protect the state's vital interest in protecting the physical and psychological well-being of child abuse victims:

> In sum, we conclude that where necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child's ability to communicate, the Confrontation Clause does not prohibit use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation.

*Id.* at 857, 110 S.Ct. at 3170.

In reaching this conclusion, the Court in *Craig* set out the factors that trial courts must consider before finding it necessary to subordinate the accused's right of face-to-face confrontation to a child victim's need for protection:

> The requisite finding of necessity must of course be a case-specific one: the trial court must hear evidence and determine whether use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify. The trial court must also find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant. Denial of face-to-face confrontation is not needed to further the state interest in protecting the child witness from trauma unless it is the presence of the defendant that causes the trauma. In other words, if the state interest were merely the interest in protecting child witnesses from courtroom trauma generally, denial of face-to-face confrontation would be unnecessary because the child could be permitted to testify in less intimidating surroundings, albeit with the defendant present. Finally, the trial court must find that the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimis, i.e.,* more than "mere nervousness or excitement or some reluctance to testify[.]"

*Id.* at 855–56, 110 S.Ct. at 3169 (citations omitted) (quoting *Wildermuth v. State,* 310 Md. 496, 530 A.2d 275, 289 (1987)).

The *Craig* Court did not specify the minimum level of emotional trauma that would justify a denial of confrontation. Instead, the Court found the Maryland statute that was at issue in the case to be clearly sufficient to meet constitutional standards. That statute required the trial court to determine that "testimony by the child victim in the courtroom will result in the child suffering serious emotional distress such that the child cannot reasonably communicate." *See* Md. Cts. & Jud.Proc.Code Ann. § 9–102(a)(1)(ii)

4. The Alaska Constitution uses similar language to secure the right to confrontation. The Alaska Constitution, article I, section 11, provides, in relevant part: "In all criminal prosecutions, the accused.... is entitled ... to be confronted with the witnesses against him."

(1989) (quoted in *Craig,* 497 U.S. at 841 n. 1, 110 S.Ct. at 3161 n. 1).

This court has read *Craig* to establish a rule premised on actual necessity:

> We are convinced that, at a minimum, the constitution forbids denying the accused face-to-face confrontation with an accuser in a criminal trial absent specific evidence and an express finding that the probable effect of the defendant's presence on the witness would significantly impair the substance of the witness's testimony. A mere finding of some general, or *de minim[i]s* effect will not suffice. Likewise, generalized, subjective impressions or assumptions will not substitute for case-specific evidence.

*Blume v. State,* 797 P.2d 664, 674 (Alaska App.1990) (footnotes omitted).

### B. AS 12.45.046's Compliance with the Constitutional Standard

██ In the present case, Reutter correctly notes that AS 12.45.046 does not, on its face, comport with the minimal requirements of *Craig.* Although the statute does incorporate procedures aimed at maintaining the rigorously adversarial atmosphere that *Craig* demands in order to ensure effective cross-examination, it does not explicitly require a finding of necessity based on the likelihood of serious emotional distress. Nor does it explicitly address another *Craig* requirement:

a finding that the child witness' emotional distress will be caused specifically by the presence of the defendant, rather than the general courtroom atmosphere.

In our view, however, although these requirements are not explicitly stated in AS 12.45.046, they should be deemed an implicit part of the statutory provision. Nothing in AS 12.45.046 is incompatible with or otherwise bars a reading of the provision to be consistent with *Craig.* Such a reading is in keeping with the legislature's intent to promote the state's vital interest in protecting the emotional well-being of child victims and witnesses.[5] Such a reading is also in keeping with the traditional preference for interpreting statutes in a manner that avoids constitutional problems.

We have previously found AS 12.45.046 to be in "substantial accord" with *Craig* "as to the minimal requirements of the confrontation clause." *Blume,* 797 P.2d at 674. *See also Brandon v. State,* 839 P.2d 400, 409 & n. 6 (Alaska App.1992); *Renkel v. State,* 807 P.2d 1087, 1094 & n. 7 (Alaska App.1991). We have similarly found AS 12.45.046 in substantial accord with the Maryland statute that *Craig* upheld. *Blume,* 797 P.2d at 674. Like Alaska's statute, the Maryland provision upheld in *Craig* did not expressly require a finding that the child witness would suffer "serious emotional distress" as a result of the presence of the defendant.[6] Rather, the Maryland Court of Appeals had inter-

**5.** The legislative intent behind AS 12.45.046 was stated as follows:

> It is the purpose of this Act that, in providing alternative methods for taking the testimony of a child in certain criminal proceedings in which that child was the victim or is to be a witness, the legislature is acting (1) to balance the need for the victim's or witness's testimony against the right of the defendant to confront witnesses; (2) to mitigate the mental and emotional distress that may arise as the child is required to testify; and (3) to minimize possible victim harassment by limiting the opportunities for unnecessary examination of the child by the parties' counsel.

CS for House Bill No. 323, section 1, ch. 92 SLA 1988 (Judiciary).

**6.** *See* Section 9–102 of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland (1989):

> (a)(1) In a case of abuse of a child as defined in § 5–701 of the Family Law Article or Article 27, § 35A of the Code, a court may order that the testimony of a child victim be taken outside the courtroom and shown in the courtroom by means of a closed circuit television if:
> (i) The testimony is taken during the proceeding; and
> (ii) The judge determines that testimony by the child victim in the courtroom will result in the child suffering serious emotional distress such that the child cannot reasonably communicate.
> (2) Only the prosecuting attorney, the attorney for the defendant, and the judge may question the child.
> (3) The operators of the closed circuit television shall make every effort to be unobtrusive.
> (b)(1) Only the following persons may be in the room with the child when the child testifies by closed circuit television:

preted its statute to include this requirement, and the *Craig* Court ratified the Maryland court's interpretation. *See Craig*, 497 U.S. at 858, 110 S.Ct. at 3170. Other states have shown little reluctance to construe similar statutory provisions as being consistent with *Craig*'s requirements.[7]

■ In short, we conclude that AS 12.45.046 must be construed to incorporate the requirements of *Craig*. In order to comply with *Craig*, a determination of "the child's inability to effectively communicate" under AS 12.45.046(a)(2) must be based on case-specific evidence establishing that (1) "the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant," *Craig*, 497 U.S. at 856, 110 S.Ct. at 3169; (2) confrontation would pose a threat of serious emotional harm to the child—in other words, "that the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimis*,"; and (3) the use of the special procedure authorized under AS 12.45.046 is therefore "necessary to protect the welfare of the particular child witness who seeks to testify." *Id.* at 855, 110 S.Ct. at 3169.

One additional problem of interpretation remains. *Craig* did not determine the standard of proof governing these requirements.

In *Blume v. State*, this court similarly found it unnecessary to decide the standard of proof required under *Craig*. We did acknowledge, however, that a finding of necessity under *Craig* would, at a minimum, have to be based on proof by a preponderance of the evidence. *Blume*, 797 P.2d at 674. The issue of standard of proof is squarely presented in Reutter's case and may no longer be avoided. Our decision on this point must be guided by the due process analysis specified in *Santosky v. Kramer*, 455 U.S. 745, 755, 102 S.Ct. 1388, 1395–96, 71 L.Ed.2d 599 (1982), which ties the applicable standard of proof to a consideration and balancing of three factors: "the private interests affected, the public interests, and a societal judgment about how the risk of error should be distributed between the litigants." *See W.M.F. v. State*, 723 P.2d 1298, 1300 (Alaska App. 1986).

Given the constitution's express protection of confrontation as an individual right of the accused, and given further the traditional significance of that right, the private interest affected by AS 12.45.046 is of utmost significance. On the other side of the balance, however, the public unquestionably has a vital interest in promoting the well-being of children who are victims of or witnesses to acts of assault and sexual abuse. Yet the public also has a vital and undeniable interest

(i) The prosecuting attorney;
(ii) The attorney for the defendant;
(iii) The operators of the closed circuit television equipment; and
(iv) Unless the defendant objects, any person whose presence, in the opinion of the court, contributes to the well-being of the child, including a person who has dealt with the child in a therapeutic setting concerning the abuse.
(2) During the child's testimony by closed circuit television, the judge and the defendant shall be in the courtroom.
(3) The judge and the defendant shall be allowed to communicate with the persons in the room where the child is testifying by any appropriate electronic method.
(c) The provisions of this section do not apply if the defendant is an attorney pro se.
(d) This section may not be interpreted to preclude, for purposes of identification of a defendant, the presence of both the victim and

the defendant in the courtroom at the same time.
*Quoted in Craig*, 497 U.S. at 840–41 n. 1, 110 S.Ct. at 3161.

**7.** *See State v. Chisholm*, 250 Kan. 153, 825 P.2d 147, 151–52 (1992). *Accord Thomas v. People*, 803 P.2d 144, 149–51 (Colo.1990); *People v. Weninger*, 243 Ill.App.3d 719, 183 Ill.Dec. 224, 229–30, 611 N.E.2d 77, 82–83 (1993); *Brady v. State*, 575 N.E.2d 981, 986 (Ind.1991); *State v. Naucke*, 829 S.W.2d 445, 450 (Mo.1992) (en banc); *State v. Peters*, 133 N.H. 791, 587 A.2d 587, 590 (1991); *State v. Self*, 56 Ohio St.3d 73, 564 N.E.2d 446, 453–54 (1990); *Shipman v. State*, 816 P.2d 571, 574–75 (Okla.Crim.App. 1991); *Gonzales v. State*, 818 S.W.2d 756, 764 (Tex.Crim.App.1991); *State v. Lomprey*, 173 Wis.2d 209, 496 N.W.2d 172, 175 (1992), *review denied* 497 N.W.2d 130. *Cf. Starnes v. State*, 307 S.C. 247, 414 S.E.2d 582 (1991).

in protecting the innocent against conviction. Because of the integral role confrontation plays in the adjudication of innocence and guilt, and its direct bearing on the integrity of fact-finding at trial, *see Coy,* 487 U.S. at 1017–20, 108 S.Ct. at 2801–03, it would be difficult to maintain that the public's interest in securing the right of confrontation against unnecessary incursion should be deemed any less significant than its interest in protection of the child victim or witness of abuse.

■ These considerations counsel that any risk of error in balancing the individual right against the countervailing public interest must fall on the side of protecting the innocent from an unjust conviction. In our view, the preponderance of the evidence standard cannot provide such protection, and no dilution of the right to confrontation should be permitted without an express finding that the requirements of AS 12.45.046, including the *Craig* requirements that are implicit therein, have been met by clear and convincing evidence. So construed, AS 12.45.046 is not constitutionally infirm.[8]

### 2. *Constitutionality of AS 12.45.046 as Applied to this Case*

In applying AS 12.45.046 to the circumstances of Reutter's case, Judge Zervos interpreted the statute to incorporate the *Craig* requirements and found the clear and convincing evidence standard of proof to be applicable. Reutter nonetheless argues that the application of AS 12.45.046 to his case violated his right to confrontation. Reutter advances this argument in three prongs: (1) he contends that the trial court erred in

allowing unqualified expert witnesses to testify and in admitting hearsay statements through their testimony; (2) he argues that the trial court's findings and conclusions are erroneous; and (3) he maintains that insufficient evidence was presented to support the conclusion that the applicable constitutional standards were met. We address each facet of Reutter's argument in turn.

### A. Expert Qualifications and Hearsay

■ Reutter argues that the trial court erroneously received expert testimony from three of the four witnesses who testified at the evidentiary hearing: DFYS Social Worker Sandra Beare–Spencer, child advocate Betsy Willis, and Assistant Attorney General Jan Rutherdale. He contends that the witnesses were asked questions that called for psychological education and expertise beyond their qualifications.

Reutter relies on Alaska Rule of Evidence 702(a):

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

This rule, however, gives the trial court broad latitude to allow a witness to testify as an expert when the court finds that the testimony will be helpful to the factfinder. There is no requirement that a witness possess a particular license or academic degree, provided that the factfinder can receive appreciable help from the witness' testimony.

---

8. Reutter argues that we should construe the Alaska Constitution's confrontation clause to provide broader protections than those provided for by the federal constitution, as interpreted by the United States Supreme Court in *Craig.* However, Reutter points to nothing in the text, context, or history of the Alaska Constitution that would justify construing article I, section 11 more broadly than the sixth amendment under the circumstances presented here; nor has Reutter advanced any cogent argument to support the conclusion that we should reject, as unpersuasive, the United States Supreme Court's interpretation of the federal constitution's confrontation

clause. *See Mitchell v. State,* 818 P.2d 1163, 1165 (Alaska App.1991) (broader interpretation of the Alaska Constitution justified only if United States Supreme Court's interpretation of the federal constitution is unpersuasive or if the text, context, or history of the Alaska Constitution justify departure). Under the circumstances presented here, we decline to construe article I, section 11, of the Alaska Constitution more broadly than the United States Supreme Court has interpreted the federal constitution.

*Handley v. State,* 615 P.2d 627, 630–31 (Alaska 1980); *Dymenstein v. State,* 720 P.2d 42, 45 (Alaska App.1986). The trial court's decision to allow a witness to testify as an expert is reviewable only for an abuse of discretion. *Handley,* 615 P.2d at 630; *New v. State,* 714 P.2d 378, 380 (Alaska App.1986).

■ In the present case, all of the challenged witnesses had professional experiences that made their opinions helpful to the trial court, and all had considerable contact with A.R. While these witnesses did not possess expertise in the field of psychology, neither did they pretend to address deep psychological issues. The trial court did not abuse its discretion in finding the qualifications of these witnesses sufficient to allow them to testify as experts. *See, e.g., Kosbruk v. State,* 820 P.2d 1082, 1086–87 (Alaska App. 1991); *see also Hilburn v. State,* 765 P.2d 1382, 1386 (Alaska App.1988).

■ Moreover, although the testimony of the challenged witnesses was necessarily informed by their educational and professional backgrounds, their opinions were almost wholly based on reasonable inferences drawn from their own recent observations of A.R. In this regard, Alaska Rule of Evidence 701 provides:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

Hence, even if the expertise of Beare–Spencer, Willis, and Rutherdale to some degree fell short of meeting the standard established for experts under Alaska Rule of Evidence 702, their opinions were properly admitted under Alaska Rule of Evidence 701's more permissive standard governing opinion testimony by lay witnesses. *See, e.g., In re D.J.A.,* 793 P.2d 1033, 1036 (Alaska 1990); *see also Callahan v. State,* 769 P.2d 444, 446 (Alaska App.1989).[9]

■ Reutter also advances a conclusory argument that the state's witnesses were improperly allowed to introduce inadmissible hearsay. Reutter's claim pertains to testimony of the witnesses relating various statements made by A.R., primarily those in connection with her inability to testify at the CINA hearing.[10] "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in

9. To the extent Reutter means to suggest that the testimony of a qualified psychologist or psychiatrist should be a prerequisite to a finding of necessity under AS 12.45.046, the suggestion is unwarranted under the peculiar circumstances of this case. Although there is much to be said for the proposition that psychological evidence will normally be necessary to meet the requirements of AS 12.45.046, *cf. Craig v. State,* 322 Md. 418, 588 A.2d 328, 335–36 (1991), Reutter disregards the fact that Judge Zervos had available and did consider the extensive written evaluation of A.R. submitted by Dr. Brems, a clinical psychologist. While Brems did not expressly address the *Craig* requirements, her evaluation of A.R. provided perspective for the court's assessment of the opinions of Beare–Spencer, Willis, and Rutherdale.

An even more significant flaw in Reutter's argument is his disregard of Judge Zervos' reliance on evidence of A.R.'s "shutdown" at the CINA proceeding—a virtual dry run of the situation that could have arisen had A.R. been called upon to testify in Reutter's presence at the criminal trial. Judge Zervos was able to review the tape recording of the CINA hearing, and the bulk of

the testimony presented by the challenged witnesses was devoted to describing in greater detail the recorded events that Judge Zervos heard on the tape. The availability of this experiential base for predicting A.R.'s probable reaction to Reutter's presence at trial adds a unique dimension to Reutter's case and significantly reduces the need for speculation based on psychological prediction.

10. The hearsay statements that Reutter contends were improperly admitted are as follows: (1) Beare–Spencer's recapitulation, in response to the prosecutor's inquiry into the basis of her opinion that A.R. would not be able to communicate effectively in Reutter's presence, of A.R.'s concern that her father would hurt her mother if she talked about what happened to her; (2) Willis' testimony, in response to the prosecutor's inquiry into the nature of her relationship with A.R., that A.R. had first disclosed to her that she had been sexually abused by Reutter; (3) Willis' testimony that some of the bases for her opinion that A.R. would not be able to communicate effectively in Reutter's presence were A.R.'s statements, "I can't talk when he's smiling at me[, h]e's staring at me[, h]e's whispering about

evidence to prove the truth of the matter asserted." Alaska Rule of Evidence 801(c). As correctly recognized by Judge Zervos, the bulk of the contested testimony was not introduced to prove the truth of the matter asserted and was therefore not hearsay; the limited statements arguably admitted to prove the truth of the matter they asserted were properly received under the hearsay exceptions governing present sense impression, excited utterance, and existing mental or emotional condition. Alaska Rule of Evidence 803(1), (2), & (3). We find no abuse of discretion. *Hawley v. State,* 614 P.2d 1349, 1361 (Alaska 1980); *Lipscomb v. State,* 700 P.2d 1298, 1306 (Alaska App.1985).[11]

### B. Errors in Factual Findings and Legal Conclusions

██ Reutter argues that the trial court made several erroneous factual findings in its written order that affected its decision to allow A.R. to testify via one-way closed-circuit television. This court will reverse factual findings only when they are clearly erroneous. *Matter of R.K.,* 851 P.2d 62, 66 (Alaska 1993). "Findings are clearly erroneous when the reviewing court is left with a definite and firm conviction after reviewing the entire record that a mistake has been made." *Id.* Having carefully reviewed the record, we conclude that Reutter's claims of erroneous fact findings are either unfounded or involve facts that were clearly inconsequential to the resolution of the disputed legal issues. The trial court's findings and conclusions are not clearly erroneous.

### C. Sufficiency of the Evidence

██ Reutter further contends that, even if no other error occurred, Judge Zervos could not have properly concluded, based on the evidence presented, that A.R.'s inability

to testify at trial would be caused by Reutter's presence, rather than by the general courtroom setting. He argues that, while the witnesses at the evidentiary hearing all testified that A.R. would not be able to testify in front of her father, they also indicated that A.R. would likely not testify even if Reutter were not present. In effect, Reutter challenges the trial court's conclusions number five and six, which read:

5. The court recognizes that it may be that [A.R.] also has difficulty testifying in front of a room full of people. However, it is very clear, based on the CINA hearing, that [A.R.] does have great difficulty in testifying in front of her parents. The court concludes, based on what has gone on before, that if the child were brought into the courtroom in an attempt to have her testify in front of her father, that she would "shut down" as she did in the CINA hearing and not testify under any other circumstances after that.

6. It is clear that [A.R.] will not testify because of fear, guilt or severe psychological distress. It is also clear that [A.R.'s] failure to testify is due, in large part, to the presence of her father. Therefore, under the statutes and the case law the confrontation clause must give way in the most minimal way possible. Allowing the child's testimony to be taken outside of the defendant's presence may facilitate the child's ability to testify. Denying the request to take the testimony outside the defendant's presence, based in [sic] past attempts, guarantees the child's silence.

Reutter makes the mistake of viewing the evidence in the light most favorable to his case, rather than in light of the factual findings made by the trial court. Judge Zervos' findings were based on a careful consideration of the factors specified in AS 12.45.046(b). As directed by the statute, the judge considered A.R.'s chronological age, her developmental level, and the degree of

---

me"; and (4) Rutherdale's testimony that one of the bases for her opinion that A.R. would not be able to communicate effectively in Reutter's presence was A.R.'s whispered concern about her parents' talking to each other during her testimony.

11. Both parties have assumed, without discussing the issue, that the formal rules of evidence should apply to a finding of necessity under AS 12.45.046. The assumption is questionable. *See* A.R.E. 101(c)(1). Our conclusion that no hearsay violations occurred makes it unnecessary for us to decide the point.

emotional and psychological injury that she had already suffered and would likely suffer if forced to testify in court. As we have already determined, Judge Zervos' factual findings are not clearly erroneous. In our view, these findings amply support the court's ultimate conclusions that "[A.R.] will not testify because of fear, guilt or severe psychological distress," and that requiring her to testify in Reutter's presence would virtually guarantee her silence.

Reutter's argument also overlooks the unique significance of A.R.'s "shut down" at the prior CINA hearing and the central role of that event in Judge Zervos' determination. As Judge Zervos concluded, "Denying the request to take the testimony outside the defendant's presence, *based in [sic] past attempts*, guarantees the child's silence." (Emphasis added.) Even if the opinions expressed by the witnesses at the evidentiary hearing were fully discounted, their compelling testimony concerning A.R.'s demeanor and conduct at the CINA hearing provided strong support for the court's conclusion that A.R.'s inability to testify stemmed from Reutter's presence, not the generally stressful atmosphere prevailing in the courtroom.

We conclude that the evidence presented below was sufficient to support the trial court's finding of necessity under AS 12.45.046 and that application of the statute to Reutter's case did not result in a violation of his constitutional right to confrontation.[12]

The convictions are AFFIRMED.

---

**12.** *Reutter separately alleges a violation of his right to procedural due process occasioned by the specific manner in which the court implemented A.R.'s questioning outside Reutter's presence. In particular, Reutter asserts that (1) A.R. refused to respond during the cross-examination; (2) his attorney was not able to gauge the reaction of the jury while he cross-examined A.R.; and (3) the jury was not able to view his interaction with A.R. during her testimony. However, Reutter did not complain to the trial court that he was unable to effectively cross-examine A.R.; from the record as a whole, it appears that Reutter's attorney did cross-examine A.R. effectively. Moreover, any difficulty that Reutter experienced in attempting to cross-examine appears to have been brought on, not by the closed-* circuit television procedure, but by the inappropriate encounters between A.R. and her parents. *Cf. Brandon v. State,* 778 P.2d 221, 227–28 (Alaska App.1989) (no violation of defendant's right of confrontation when witness' absence results from conduct of the accused). *With respect to the remaining assertions, it is sufficient to observe that, although Reutter continued throughout the trial to object to the taking of A.R.'s testimony by closed-circuit television generally, he specifically stated that he did not object to the procedure that the trial court implemented. Reutter's claims of interference with the jury's view of his interaction with A.R. are wholly unsubstantiated by the record.*